**COMMONWEALTH of Pennsylvania,**
**Appellee**

v.

**T. Fletcher HAIGH, Appellant.**

Superior Court of Pennsylvania.

Submitted Aug. 2, 2004.
Filed April 18, 2005.
Reargument Denied June 17, 2005.

Kurt B. Geishauser, Reading, for appellant.

Douglas J. Waltman, Asst. Dist. Atty., Reading, for the Com., appellee.

Before: ORIE MELVIN, McCAFFERY, and TAMILIA, JJ.

McCAFFERY, J.:

¶ 1 Appellant, T. Fletcher Haigh, asks us to determine whether the trial court properly convicted him of indirect criminal contempt for violating a Protection from Abuse Order ("PFA order").[1] We hold that the evidence was insufficient to establish that Appellant acted with "wrongful intent" under the peculiar circumstances of this case. As a result, we are constrained to reverse Appellant's conviction and vacate the judgment of sentence.

¶ 2 The relevant factual and procedural history is as follows. On August 21, 2003, Appellant and his wife of thirty-one (31) years, Christine Haigh, entered into a final PFA order prohibiting Appellant from, *inter alia*, having any contact with his wife until February 21, 2005. (Trial Court Opinion, dated March 22, 2004, at 1) (Notes of Testimony Contempt Hearing ("N.T."), 1/22/04, at 6). Less than six months later, Appellant was brought before the Honorable Mary Ann Campbell for an indirect criminal contempt hearing on charges that he had violated the PFA order by attempting to contact his wife from prison both by letter and by phone. (N.T. at 10).[2] Appellant had been trying

---

1. 23 Pa.C.S.A. § 6114.

2. Admitting his mistake and taking responsibility therefor, Appellant pled guilty to those charges.

to contact his wife because their son had written to let him know that Mrs. Haigh had had a mass removed from her breast. The letter did not say whether the mass was malignant or benign. (*Id.* at 11–12). Appellant was brought to the courtroom in shackles by deputy sheriffs. (*Id.* at 9). At one point during the hearing on January 15, 2004, Appellant, still shackled, shuffled slightly towards his wife, leaned over and asked her "Are you okay on top?" He urged her to write him in prison about her prognosis. (*Id.* at 11). Deputy Sheriff David Franke quickly pulled Appellant back and charged him with indirect criminal contempt. (*Id.* at 9).

¶ 3 On January 22, 2004, Judge Campbell held a hearing on the contempt charge, and Appellant, Mrs. Haigh and the Deputy Sheriff Franke all testified. Neither the deputy sheriff nor Mrs. Haigh testified that Appellant had said or done anything threatening towards her. In fact, Mrs. Haigh testified that she had *not* felt threatened by Appellant's actions and words under the circumstances. (*Id.* at 7). Nevertheless, Judge Campbell found Appellant guilty of *indirect criminal contempt* and sentenced him to three months' probation. Appellant appeals from this judgment of sentence and presents the following issue for our review:

> WHETHER THE EVIDENCE WAS SUFFICIENT TO ESTABLISH THE NECESSARY ELEMENTS OF THE CHARGE BEYOND A REASONABLE DOUBT[?]

(Appellant's Brief at 4).

¶ 4 Appellant contends that the evidence was insufficient to establish that he was guilty of indirect criminal contempt because it failed to prove that he acted with "wrongful intent." (Appellant's Brief at 8–9). We agree.

3.  23 Pa.C.S.A. §§ 6101, *et seq.*

¶ 5 The Protection from Abuse Act (PFAA) [3] confers upon courts the power to hold a defendant who violates a PFA order in "indirect criminal contempt and punish the defendant in accordance with the law." 23 Pa.C.S.A. § 6114(a). Courts were given this authority in order to vindicate the purposes underlying the PFAA:

> Hailed as a vanguard measure to deal with problems of abuse, the act was designed to advance the prevention of physical and sexual abuse. In an effort to prevent domestic violence it concomitantly promotes the security of the home. Because every individual has a right to feel secure in their [sic] home and to be free of violence, our Commonwealth has seen fit to provide these measures for the protection of its citizens.
>
> * * *
>
> A charge of indirect criminal contempt consists of a claim that a violation of an order or decree of court occurred **outside the presence of the court**. Where a PFA order is involved, an indirect criminal contempt charge is designed to seek punishment for a violation of the protective order. The "role of criminal contempt and that of many ordinary criminal laws seem identical—protection of the institutions of our government and enforcement of their mandates." Thus, as with those accused [of] other crimes, one charged with indirect criminal contempt is to be provided the safeguards which statute and criminal procedures afford.

*Commonwealth v. Baker,* 722 A.2d 718, 720–721 (Pa.Super.1998) (*en banc*) (citations omitted) (emphasis added).

¶ 6 "[W]hen reviewing a contempt conviction, much reliance is given to the discretion of the trial judge. Accord-

ingly, we are confined to a determination of whether the facts support the trial court's decision. We will reverse a trial court's determination only when there has been a plain abuse of discretion." *Commonwealth v. Kolansky*, 800 A.2d 937, 939 (Pa.Super.2002) (internal quotations and citations omitted). Yet we remain mindful that the power to impose a sanction of criminal contempt should not be used when a lesser means would suffice, as it is an actual criminal conviction. *Id.* at 939 (citing *Commonwealth v. Jones*, 700 A.2d 1008, 1013 (Pa.Super.1997)).

¶ 7 A finding of criminal contempt must be supported by the following four elements:

(1) The [court's] order or decree must be definite, clear, specific and leave no doubt or uncertainty in the mind of the person to whom it was addressed of the conduct prohibited;

(2) The contemnor must have had notice of the specific order or decree,

(3) The act constituting the violation must have been volitional; and

(4) the contemnor must have acted with wrongful intent.

*Baker*, 722 A.2d at 721 (citing *Diamond v. Diamond*, 715 A.2d 1190, 1196).

¶ 8 In the case *sub judice*, the final PFA order prohibited Appellant from having any contact with his wife "at any location." Although this language seems unambiguous on its face, context ultimately caused confusion for Appellant in that he was literally brought into a form of contact with his wife during the PFA violation hearing. Moreover, both Appellant and Mrs. Haigh had the opportunity to speak at this hearing. A reasonable person could have believed, and Appellant did

believe, that the PFA order was relaxed to some extent in the courtroom context, especially where Appellant was shackled and the victim was protected by an armed deputy sheriff. Appellant did not believe that he was threatening Mrs. Haigh, and neither she nor any one else in the courtroom heard Appellant threaten her or otherwise make any threatening movements or gestures towards her. Appellant's questions arose from his concern for the health of his wife of thirty-one years, even though they were estranged at the time. After a thorough review of the record, we conclude, based upon all of the circumstances, that Appellant did not act with wrongful intent by engaging in this conversation with his wife in the courtroom.[4] Intentionally acting in such a manner, in the presence of Judge Campbell, the deputy sheriff, the prosecutor and every other person gathered in the court room, would have been nothing short of irrational, and there is nothing in the record to indicate that Appellant was in any way irrational on the day of the hearing. In fact, the judge concluded that Appellant was sufficiently rational to enter guilty pleas to two prior violations of the PFA at the very same hearing.

¶ 9 It is imperative that trial judges use common sense and consider the context and surrounding factors in making their determinations of whether a violation of a court order is truly *intentional* before imposing sanctions of criminal contempt. As we have stated:

[A] determination of criminal contempt is a criminal conviction conferring on the contemnor all the negative characteristics of being a convicted criminal. The right to be free of the stigma of an

---

4. Indeed, in actuality, Appellant's conversing with his wife while *in the courtroom* does not even fit within the definition of *indirect* crimi-nal contempt, which addresses contemptuous actions *outside the presence of the court*. *See Baker, supra.*

unfounded criminal conviction is the hallmark of American jurisprudence.

*Baker,* 722 A.2d at 722.

¶ 10 Under the peculiar circumstances of this case,[5] because we conclude that the record does not support the determination that Appellant intended to violate the final PFA order *and* because the infraction was both *de minimis* and non-threatening, we are constrained to hold that the trial court did abuse its discretion in convicting appellant of indirect criminal contempt. Accordingly, we vacate Appellant's judgment of sentence.

¶ 11 Judgment of sentence vacated. Jurisdiction is relinquished.

¶ 12 *Judge* ORIE MELVIN files a Dissenting Statement.

ORIE MELVIN, J., dissenting.

¶ 1 I respectfully disagree with the majority's conclusion that "the evidence was insufficient to establish that Appellant acted with 'wrongful intent' under the peculiar circumstances of this case." Majority opinion at 1176. The circumstances are not so "peculiar" as the majority believes. It is not unusual for an abuser who is sanctioned by a PFA order to attempt to circumvent the no contact directive of that order by resort to subterfuge or present some pretext in order to contact his victim. What someone who has never been placed in danger by an abusive spouse or paramour would perceive as a threat is different from what the victim of such abuse

perceives. It is the contact alone that can be intimidating for it places in the mind of the victim the notion that the abuser will continue to intrude into her life, even after she has sought the protection of the legal system.

¶ 2 Moreover, the majority overlooks the fact that Appellant pleaded guilty to prior violations of the PFA order for having contact with his wife by phone and letter premised upon the same alleged concern for his wife's health. The trial court was certainly within its discretion in refusing to credit Appellant's stated reason for initiating contact with Mrs. Haigh. The irony of an abuser suddenly being so overwhelmingly concerned for the health and well-being of his victim that he felt compelled to violate the clear dictate of the PFA order, not once but three times, was not lost on the trial judge. Simply stated, no contact means no contact for any reason. I would find that the facts support the trial court's decision, and there has been no showing of a plain abuse of discretion.

¶ 3 Accordingly, I must respectfully dissent.

---

5. We acknowledge our colleague's disagreement with the conclusion herein, and decline to engage in generalizations and hyperbole. We note that one need not have been personally placed in danger by an abuser to have witnessed, comprehended, and been spurred to action by the effects of such abuse on a victim, female or male. There are certainly occasions, however, when those who stand accused are innocent of the crimes charged, and we determine that to be the case here. Appellant testified that he believed he could speak with his wife in the courtroom and not be in violation of the PFA order, and Mrs. Haigh testified that she *did not feel threatened* by Appellant's actions or words in the courtroom. (N.T. at 7, 12). The Commonwealth had the burden of establishing that Appellant acted with "wrongful intent," see *Baker, supra,* and failed to do so.