J-S78001-16

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| COMMONWEALTH OF PENNSYLVANIA, | IN THE SUPERIOR COURT OF PENNSYLVANIA |
|---|---|
| Appellee | |
| v. | |
| DORIAN HARRIS, | |
| Appellant | No. 903 WDA 2015 |

Appeal from the Judgment of Sentence Entered May 20, 2015
In the Court of Common Pleas of Allegheny County
Civil Division at No(s): FD-14-02045

BEFORE:  BENDER, P.J.E., OTT, J., and FITZGERALD, J.[*]

MEMORANDUM BY BENDER, P.J.E.:               **FILED NOVEMBER 7, 2016**

Appellant, Dorian Harris, appeals from the judgment of sentence of two concurrent terms of 6 months' imprisonment, imposed after he was convicted of two counts of indirect criminal contempt (ICC), 23 Pa.C.S. § 6114.  Harris challenges the sufficiency of the evidence to sustain his ICC convictions.  After careful review, we affirm in part and reverse in part.

Harris was charged with two counts of ICC stemming from separate incidents where he encountered Markia Jones and purportedly violated a protection from abuse (PFA) order that Jones had obtained against him. Following an ICC hearing on May 20, 2015, the trial court found Harris guilty of both charges.  That same day, the court sentenced Harris to 6 months'

_____

[*] Former Justice specially assigned to the Superior Court.

incarceration for each ICC offense, imposed to run concurrently. Harris filed a timely notice of appeal, and also timely complied with the court's order to file a Pa.R.A.P. 1925(b) concise statement of errors complained of on appeal. The court filed a responsive opinion on March 7, 2016.

Herein, Harris presents one issue for our review: "Whether the trial court committed reversible error as the evidence was insufficient to sustain [Harris's] conviction for both counts of indirect criminal contempt." Harris's Brief at 5.

> Our standard of review in assessing whether sufficient evidence was presented to sustain appellant's conviction is well-settled.

>> The standard we apply in reviewing the sufficiency of the evidence is whether viewing all the evidence admitted at trial in the light most favorable to the verdict winner, there is sufficient evidence to enable the fact-finder to find every element of the crime beyond a reasonable doubt. In applying [the above] test, we may not weigh the evidence and substitute our judgment for the fact-finder. In addition, we note that the facts and circumstances established by the Commonwealth need not preclude every possibility of innocence. Any doubts regarding a defendant's guilt may be resolved by the fact-finder unless the evidence is so weak and inconclusive that as a matter of law no probability of fact may be drawn from the combined circumstances. The Commonwealth may sustain its burden of proving every element of the crime beyond a reasonable doubt by means of wholly circumstantial evidence. Moreover, in applying the above test, the entire record must be evaluated and all evidence actually received must be considered. Finally, the trier of fact while passing upon the credibility of witnesses and the weight of the evidence produced, is free to believe all, part or none of the evidence.

> ***Commonwealth v. DiStefano***, 782 A.2d 574, 582 (Pa. Super. 2001) (citations and quotations omitted).

> A charge of indirect criminal contempt consists of a claim that a violation of an Order or Decree of court occurred outside the presence of the court. ***Commonwealth v. Padilla***, 885 A.2d 994 (Pa. Super. 2005). "Where a PFA order is involved, an indirect criminal contempt charge is designed to seek punishment for violation of the protective order." ***Id.*** at 996. As with those accused of any crime, "one charged with indirect criminal contempt is to be provided the safeguards which statute and criminal procedures afford." ***Id.*** at 996–97 (citation omitted). To establish indirect criminal contempt, the Commonwealth must prove: 1) the Order was sufficiently definite, clear, and specific to the contemnor as to leave no doubt of the conduct prohibited; 2) the contemnor had notice of the Order; (3) the act constituting the violation must have been volitional; and 4) the contemnor must have acted with wrongful intent. ***Commonwealth v. Ashton***, 824 A.2d 1198, 1202 (Pa. Super. 2003).

***Commonwealth v. Brumbaugh***, 932 A.2d 108, 109–10 (Pa. Super. 2007).

In this case, Markia Jones obtained a final PFA order against Harris on November 18, 2014. Harris does not dispute that he had notice of the PFA order. However, he challenges each of his two ICC convictions for violations of that order on slightly different grounds. We will address his arguments pertaining to each incident in turn.

First, Harris contends that the evidence was insufficient to support his ICC conviction for an encounter he had with Jones on January 19, 2015. At the ICC hearing, Jones testified that on that date, she was employed by "XO Café and Lounge" and, as part of that employment, she would "do bottle service at certain shows that go on throughout Pittsburgh." N.T. Hearing, 5/20/15, at 7. On January 19, 2015, Jones was working an event at a night

club called the Penthouse. *Id.* at 8. She testified that she was walking through the club with drinks in her hand when Harris walked past her. *Id.* Jones stated that Harris "looked at [her] and said something and continued moving." *Id.* Jones said that Harris gave her "the look of death" and she "felt threatened." *Id.* at 19. Jones called police shortly after her encounter with Harris, and he was subsequently arrested at the club. *Id.* at 9.

On appeal, Harris claims that the evidence failed to demonstrate that Jones worked at the Penthouse and, thus, the Commonwealth failed to prove he violated the provision of the final PFA order directing that he not go to Jones's place of employment. *See* Final PFA Order, 11/18/14, at 2 ¶3 (unnecessary capitalization and emphasis omitted). Harris also argues that he did not "abuse, stalk, harass, threaten or attempt to use physical force" against Jones at the club and, consequently, he did not violate that provision of the final PFA order. *See id.* at 1 ¶1 (unnecessary capitalization and emphasis omitted). Lastly, Harris contends that he did not contact Jones at the Penthouse club in violation of the PFA order's no-contact provision, which states: "Defendant shall not contact Plaintiff, protected under this order, either directly or indirectly, by telephone or by any other means, including through third persons." *Id.* at 2 ¶4.

We disagree with Harris that he did not 'contact' Jones at the club.[1] According to Jones's testimony, Harris walked past her in the Penthouse nightclub, made threatening eye contact with her, and said something. The court was permitted to infer from Jones's testimony that Harris's remark was directed at Jones and that, therefore, Harris 'contacted' Jones in violation of the PFA order's 'no-contact' provision. Moreover, contrary to Harris's argument on appeal, Jones's testimony was sufficient to establish that Harris contacted Jones intentionally, and that he did so with the purpose of making her feel scared or threatened. Thus, we affirm Harris's ICC conviction pertaining to the January 19, 2015 encounter with Jones.

However, we are compelled to reverse Harris's ICC conviction for an encounter with Jones that occurred on March 26, 2015. Jones testified that on that date, she and several friends went to the Savoy Restaurant in Pittsburgh. N.T. Hearing at 10. Jones saw Harris walk in, but he abruptly turned around and left. *Id.* A short time later, the owner of the restaurant approached Jones and "told [her] that [Harris] was outside in the parking lot…." *Id.* The owner asked Jones if she was "okay" with Harris's being there. *Id.* Jones testified that she replied, "Yeah, but that's not what the court order says. The court order says we can't be around each other. But I

_____

[1] Thus, we need not assess whether the evidence proved that the Penthouse was Jones' place of employment, or whether Harris' conduct was abusive, harassing, or amounted to an act of stalking.

told [the owner], 'This is your club,' you know. There's nothing I can do about it. And he turned around and walked away." *Id.* Shortly thereafter, Harris reentered Savoy and "sat adjacent to the area that [Jones and her friends] were sitting in…." *Id.* Jones testified that Harris sat about ten feet away from her, and remained there for "a half hour" before Jones left Savoy. *Id.* at 13. While Jones testified that Harris looked at her, she stated that he did not have any contact with her. *Id.* at 29, 30. Jones also confirmed that she did not work at Savoy. *Id.* at 11-12.

The Commonwealth also called Juandesha Purdie to the stand at the ICC hearing. Purdie testified that she is a friend of Jones and was with Jones at the Savoy on March 26, 2015. *Id.* at 33, 35. Purdie testified that she saw Harris sit at a table near where she and Jones were sitting, but Harris was not directly facing them and he at no point said anything to Jones. *Id.* at 43. Purdie did not see Harris look at Jones or "give [] Jones any type of gestures with his hands or with his face…." *Id.* Harris also did not approach Purdie and Jones's table. *Id.* at 43-44.

Harris then testified at the ICC hearing. He stated that when he entered Savoy and saw Jones, he immediately "went downstairs" and told the owner that he had to leave because he had "a problem" with Jones that involved a PFA. *Id.* at 51. Harris testified that he did not tell the owner to talk to Harris, but the owner stated that he was going to ask Jones to leave. *Id.* The owner then went upstairs to where Jones was sitting, and when he returned, he told Harris that "he talked to [Jones]," and she "said it wouldn't

be [a] problem." ***Id.*** Harris testified that he then followed the owner upstairs to the owner's table, which was close to where Jones was sitting. ***Id.*** at 51-52. Harris testified that he did not look at Jones or talk to her. ***Id.*** at 52. He further stated that he understood the PFA order as prohibiting him from contacting Jones, but that he did not think that simply being in the same room with her amounted to 'contact.' ***Id.*** at 55-56.

On appeal, Harris argues that the Commonwealth's evidence was insufficient to demonstrate that he violated the PFA order by coincidentally encountering Jones at the Savoy Restaurant. Preliminarily, Harris argues, and we agree, that the evidence proved that Jones did not work at Savoy and, therefore, he cannot be found to have violated the provision of the PFA order precluding him from going to Jones's place of employment. ***See*** Final PFA Order, 11/18/14, at 2 ¶3. He also contends that nothing in his conduct could be viewed as abusive, threatening, or an attempt to stalk Jones. Again, we agree.

Additionally, Harris avers that "[t]here is no evidence of record that [he] had any contact or attempted contact with Jones." Harris's Brief at 13. Harris also stresses that "presence and contact are not synonymous." ***Id.*** at 15. Harris further contends:

> [I]t is axiomatic they are not synonymous as the PFA order delineates what type of conduct [Harris] is prohibited from performing in Jones's presence via paragraph 1 [(relating to Harris not abusing, stalking, harassing, or using physical force on Jones)] and what location [Harris] is prohibited from traversing with respect to Jones via [p]aragraphs 2 and 3 [(pertaining to Harris's not being permitted to go to Jones's

home or place of employment, respectively)]. If [Harris] was not allowed to be in the presence of … Jones ever, the PFA order should simply state [Harris] is prohibited from being in the presence of Jones at any location [where] she may be. Consequently, any suggestion that presence and contact are synonymous is absurd.

*Id.* at 15-16.

Harris's argument is compelling. No provision of the PFA order, including the 'no-contact' provision, precludes Harris from simply being present in the same public place where Jones is located. The Commonwealth attempts to read such a prohibition into the final PFA order based on the following testimony by Jones:

[Jones:] [A]t our first court hearing the judge [said] if [Harris] sees me, if he comes anywhere and I'm already there, he's to turn around and leave. He's not to stay. He's not to talk to anybody. He's supposed to leave.

N.T. Hearing at 11. However, the record before us does not contain a transcript from the hearing alluded to by Jones. It also does not contain any court order stating that Harris is not permitted to be in the same location as Jones, and Jones's testimony alone is insufficient to demonstrate that the court ordered Harris not to do so.

Instead, the PFA order directs that Harris may not be at Jones's home or place of employment, and orders him not to ***contact*** Jones, either directly or indirectly. Jones confirmed at the hearing that Harris did ***not*** contact her at the Savoy Restaurant. Thus, no evidence demonstrated that Harris directly contacted Jones on March 26, 2015. Additionally, we can find no legal authority to support that Harris 'indirectly contacted' Jones by looking

- 8 -

at Jones while sitting 10 feet away from her in a public place. We note that Jones did not say that Harris continuously *stared* at her, or that he even frequently looked in her direction, during the half-hour that they were both in the Savoy.

In any event, even if Harris's conduct did constitute a *de minimis* violation of the 'no-contact' provision of the PFA order, we would conclude that the evidence failed to establish that Harris acted with 'wrongful intent.' This Court has emphasized that,

> [i]t is imperative that trial judges use common sense and consider the context and surrounding factors in making their determinations of whether a violation of a court order is truly *intentional* before imposing sanctions of criminal contempt. As we have stated:
>
>> [A] determination of criminal contempt is a criminal conviction conferring on the contemnor all the negative characteristics of being a convicted criminal. The right to be free of the stigma of an unfounded criminal conviction is the hallmark of American jurisprudence.

***Commonwealth v. Haigh***, 874 A.2d 1174, 1177–78 (Pa. Super. 2005) (emphasis in original) (quoting ***Commonwealth v. Baker***, 722 A.2d 718, 722 (Pa. Super. 1998) (*en banc*)).

Here, considering the context of Harris's encounter with Jones at the Savoy Restaurant, we cannot conclude that the evidence proved that Harris intentionally violated the PFA order. There was no evidence indicating that Harris knew Jones would be at Savoy. When Harris arrived at the restaurant

- 9 -

and saw Jones, he immediately left, and returned only after Jones told the owner of the restaurant that she was 'okay' with Harris's being there.[2] Harris testified that he was invited to sit at the owner's table, which happened to be close to where Jones was sitting. Jones's friend, Juandesha Purdie, confirmed that she did not see Harris talk to Jones, approach their table, or gesture to Jones in any way. Jones did not testify that Harris exhibited any threatening conduct toward her, and Jones voluntarily remained at the table near to him for approximately 30 minutes before leaving the restaurant. Finally, Harris testified that he did not believe that sitting in the same room as Jones would be a violation of the PFA order, as long as he did not communicate with her. *See* N.T. Hearing at 55-56. Based on these facts, we would conclude that the evidence failed to prove that Harris intentionally violated the 'no-contact' provision of the PFA order.

In sum, the evidence was sufficient to prove that Harris violated the PFA order on January 19, 2015, when he had contact with Harris at the Penthouse nightclub, and did so with wrongful intent. Thus, we affirm his ICC conviction based on that violation. However, the evidence failed to demonstrate that Harris contacted Jones at the Savoy Restaurant in March of 2015, or that he did so with wrongful intent. Consequently, Harris's ICC conviction for the March 26, 2015 incident is reversed, and his sentence of 6

---

[2] We point out that there was no evidence that Harris told the owner of the club to approach Jones and talk to her.

months' incarceration for that offense is vacated. Because the court imposed concurrent terms of 6 months' incarceration for both of Harris's ICC convictions, our disposition does not upset the court's overall sentencing scheme, and we need not remand for resentencing.

Judgment of sentence affirmed in part, reversed in part. Jurisdiction relinquished.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 11/7/2016