J-A25018-18

## NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37

| | | |
|---|---|---|
| T.J.K. | : | IN THE SUPERIOR COURT OF |
| Appellee | : | PENNSYLVANIA |
| | : | |
| v. | : | |
| | : | |
| | : | |
| M.D.C. | : | |
| | : | |
| Appellant | : | No. 3321 EDA 2017 |

Appeal from the Judgment of Sentence September 5, 2017
In the Court of Common Pleas of Delaware County Civil Division at
No(s): CV-2015-080484

BEFORE: PANELLA, J., DUBOW, J., and KUNSELMAN, J.

MEMORANDUM BY PANELLA, J.:                 **FILED MAY 23, 2019**

M.D.C. ("Mother") appeals from the judgment of sentence entered after the trial court found her guilty of indirect criminal contempt of a Protection from Abuse ("PFA") order in this highly contentious custody and visitation dispute. Mother asserts the order did not clearly give her notice that she was prohibited from entering the church where T.J.K. ("Father") and their children ("the Children") were participating in an evening mass. She also argues the evidence was insufficient to establish she acted with wrongful intent. We affirm.

This is the second of three inter-related companion appeals with a long, complex, and somewhat convoluted history. We derive the facts and procedural history of this case primarily from the trial court's opinion. Mother, Father, and Mother's parents ("Grandparents") have been involved in some

form of custody or visitation disputes over Mother and Father's two minor children ("Children") since at least 2011.

Father is a citizen of the United States. Mother is a native of Argentina.[1] Grandparents are also from Argentina. The marriage of Appellee T.J.K. and Mother resulted in two Children, M.A.K. (born in 2009) and T.M.K. (born in 2010). At various times, Mother and Father lived in Argentina, in or near Buenos Aires, and Delaware County, Pennsylvania. For a time, Grandparents lived with Father, Mother, and the Children.

Father has been granted primary physical custody of the Children in Pennsylvania on an emergency basis. Pertinent to the background of this appeal, Father filed for a Protection from Abuse order ("PFA"), alleging, *inter alia*, that Mother and the Grandparents were violent toward the Children.

Father testified that he confronted Mother about such violence toward their daughter in Colorado. In response, Father asserted, Mother attacked him, banging his head against a wall, kicking him repeatedly in the testicles, biting his hand, trying to scratch his eyes, and choking him, in the presence of the Children. A Colorado jury eventually convicted Mother of assault and harassment.

---

[1] While Father only mentions Mother's Argentinian citizenship, he does not dispute Mother's claim to dual United States and Argentinian citizenship.

Notably, Mother was also charged, but eventually acquitted, of child abuse under Colorado law for attacking Father in the presence of the Children. While the criminal charges in Colorado were pending, the Colorado court prohibited Mother from having contact the Children due to the pending child abuse charge. The Colorado order explicitly provided for the court with jurisdiction over custody claims, the Court of Common Pleas of Delaware County, to modify the no-contact order.

Father has further accused Mother and Grandparents of plotting by various means, such as trying to obtain duplicate Argentinian passports, to remove the Children from the United States and return them to Argentina to live with Mother. After Father sought a PFA order, the parties negotiated, through counsel, a stipulation that the trial court incorporated in an order.

Pertinent to the issues on appeal, Mother's visitation with Children was restricted to one hour, twice a week, held in the "gathering room" of the Children's local church in Media, PA.[2] The order required the presence of a security guard, and a Spanish/English translator during Mother's visitation.

---

[2] The address of the church was one of several specified locations that Mother agreed to stay away from as a condition of the PFA order. Mother highlights the discrepancy that she was, and was not, allowed on the church premises. However, the two provisions of the stipulated order are easily reconciled. **See Nitardy v. Chabot**, 195 A.3d 941, 952 (Pa. Super. 2018) (observing that it "is well settled that when interpreting a contract, the specific controls over the general"). Mother was specifically allowed in the gathering room for the visitation periods, but was generally banned from entering the church premises otherwise.

Further, Mother was to have no contact with the Children before or after the actual visitation period. She was to leave the church premises immediately after the visitation was over.

The parties are in substantial agreement on most of the specific facts underlying the conviction for contempt. However, they disagree on the inferences to be drawn from those facts and the law to be applied.

Briefly summarized, on the evening of June 5, 2017, the pastor of the Children's church had invited Father to a "healing Mass" in the parish chapel at 7:00 PM, after the Children's visitation hour with Mother was over.[3] Father accepted the invitation, and brought the Children with him to the Mass. The gathering room was adjacent to the chapel.

After the service had begun, Mother appeared outside the chapel. Both the security guard and the translator warned Mother that, under the visitation order and the PFA order, she was not permitted inside the chapel. The guard and translator gave the warnings in both English and Spanish. Mother entered the chapel despite these warnings. The security guard summoned the police.

_____

[3] The healing Mass was for an infant with cancer, unrelated to the parties in this appeal. Mother notes that recollections differed slightly as to whether the pastor invited Father to the Mass, or Father inquired and was invited in response. However, the exact details of the invitation are not material to any issues on appeal or arguments presented for our review.

Mother was arrested and the district attorney brought an action for indirect criminal contempt. Mother was convicted and sentenced to time served, thirty-seven days.[4] Concerning the time Mother spent in jail, it bears noting that Mother was originally considered not eligible for bail because of the pending criminal charges in Colorado. Eventually, however, she was equipped with a monitor and placed on house arrest. This timely appeal followed.[5]

Mother presents two questions on appeal for our review:

1. Where a protection from abuse order allowed contact between [F]ather and [M]other on church property during visitation, and did not address [F]ather keeping the [C]hildren at the church beyond the stipulated visit time, did a reasonable construction of the order allow [M]other to enter the chapel where her [C]hildren were at mass?

2. Where [M]other was allowed to be at the church and she entered a chapel where [F]ather had taken her [C]hildren to mass, was her entry sufficient to support her conviction of criminal contempt?

---

[4] The trial court also imposed a fine of $300.00 and extended the PFA order to December 31, 2018. Without further extension, that deadline would have expired by now. Nevertheless, we find that Mother's challenges to her conviction for criminal contempt fall within a recognized exception to the mootness doctrine, because there is a reasonable possibility Mother's conviction will result in criminal or civil collateral consequences. *See Commonwealth v. Rohde*, 402 A.2d 1025, 1026 (Pa. 1979).

[5] Mother filed an eight point concise statement of errors on or about October 25, 2017. Several of Mother's asserted errors were repetitive or over-lapped. The trial court condensed Mother's statement of errors into four issues, addressed them, and filed an opinion, on December 5, 2017. *See* Pa.R.A.P. 1925.

Mother's Brief, at 2. In her reply brief, Mother seeks to add a third argument: that "deeming [Father] the prosecutor has structurally denied due process." Mother's Reply Brief, at i. Mother cannot raise a new issue in her reply brief. *See Commonwealth v. Fahy*, 737 A.2d 214, 218 n.8 (Pa. 1999). Therefore, we will not address mother's argument that she was structurally denied due process.

Our standard of review is well-settled.

We review a contempt conviction for an abuse of discretion. We rely on the discretion of the trial court judge and are confined to a determination of whether the facts support the trial court's decision. In reviewing whether the evidence was sufficient to support the conviction, "we must determine whether the evidence admitted at trial, and all reasonable inferences drawn from that evidence, when viewed in the light most favorable to the Commonwealth as verdict winner, was sufficient to enable the fact finder to conclude that the Commonwealth established all of the elements of the offense beyond a reasonable doubt." In applying the above test, we may not weigh the evidence and substitute our judgment for the fact-finder. Finally, the trier of fact while passing upon the credibility of witnesses and the weight of the evidence produced, is free to believe all, part or none of the evidence.

This Court has repeatedly stated that the purpose of the PFA Act is to protect victims of domestic violence from those who perpetrate such abuse, with the primary goal of advance prevention of physical and sexual abuse. Where a PFA order is involved, an indirect criminal contempt charge is designed to seek punishment for violation of the protective order. A charge of indirect criminal contempt consists of a claim that a violation of an order occurred outside the presence of the court.

In order to establish indirect criminal contempt, the Commonwealth must prove: 1) the order was sufficiently definite, clear, and specific to the contemnor as to leave no doubt of the conduct prohibited; 2) the contemnor had notice of the order; 3) the act constituting the violation must have been volitional; and 4) the contemnor must have acted with wrongful intent.

- 6 –

*Commonwealth v. Felder*, 176 A.3d 331, 333–34 (Pa. Super. 2017) (brackets, quotation marks, and citations omitted).

In her first issue on appeal, Mother argues the PFA order did not provide sufficient notice of what would constitute a violation of the order. Mother contends that it was not clear that she was prohibited from entering the church after her visitation hour had ended. She cites to Father's admission that his attendance at the 7:00 p.m. mass was unusual as evidence that she could no know that her entry at that time would constitute a violation of the PFA order.

After reviewing the record and the briefs of the parties, we conclude the written opinion authored by the Honorable Dominic F. Pileggi thoroughly and adequately addresses Mother's argument. **See** Trial Court Opinion, 12/15/17, at 8-12 (finding that Mother was sufficiently conversant in English to understand the terms of the PFA; that her conduct for one and a half years after the entry of the PFA order demonstrated she understood the order's requirements; and that the security guard and translator effectively communicated to Mother that entering the church at that time would constitute a violation of the PFA). We therefore adopt the opinion as our own and affirm on that basis.

In her second issue, Mother argues the evidence was insufficient to sustain her conviction for indirect criminal contempt because Father had no reason to fear for his safety in the presence of the armed security guard. **See** *id*. She contends she reasonably expected the PFA order was relaxed under

circumstances where Father was protected by the security guard, citing *Commonwealth v. Haigh*, 874 A.2d 1174 (Pa. Super. 2005).

In *Haigh*, this Court reversed a conviction for indirect criminal contempt of a PFA order. Under the PFA order in that case, the defendant was prohibited from having contact with his wife "at any location." *See id*., at 1177. The trial court found that the defendant, bound and shackled, had violated the PFA when he addressed his wife during the PFA violation hearing. *See id*.

This Court reversed, concluding that the defendant "did not act with wrongful intent by engaging in this conversation with his wife in the courtroom." *Id*. (footnote omitted). "Intentionally acting in such a manner, in the presence of [the trial court], the deputy sheriff, the prosecutor and every other person gathered in the court room, would have been nothing short of irrational[.]" *Id*. "A reasonable person could have believed, and Appellant did believe, that the PFA order was relaxed to some extent in the courtroom context, especially where Appellant was shackled and the victim was protected by an armed deputy sheriff." *Id*.

Like in *Haigh*, Mother was prohibited from "any contact with" Husband or the Children "at any location." In addition, Mother correctly notes the presence of the armed security guard is analogous to the presence of an armed deputy sheriff in *Haigh*.

However, we find *Haigh* easily distinguishable. This was not a situation where contact with the victim was compelled by the dictates of due process,

as it was in **Haigh**. Nor was Mother shackled when she forced her way back into the church despite the protests of the security guard and the translator. It was perfectly reasonable for the trial court to find that Mother acted with wrongful intent when she re-entered the church. **See** Trial Court Opinion, 12/15/17, at 13 (finding that Mother knew she was violating the PFA order when she re-entered church despite the warnings of the guard and the translator).

As neither of Mother's issues on appeal merit relief, we affirm the judgment of sentence.

Judgment of sentence affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 5/23/19