J-S24033-23

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT OP 65.37**

| | | |
|---|---|---|
| KAYLA FLOOD | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| | : | |
| v. | : | |
| | : | |
| | : | |
| JONATHAN SLAUGHTER | : | |
| | : | |
| Appellant | : | No. 154 MDA 2023 |

Appeal from the Judgment of Sentence Entered September 21, 2022
In the Court of Common Pleas of Dauphin County Civil Division at No(s):
2022-CV-1767-AB

BEFORE:   BENDER, P.J.E., LAZARUS, J., and STEVENS, P.J.E.*

MEMORANDUM BY STEVENS, P.J.E.:                    **FILED JULY 13, 2023**

Appellant Jonathan Slaughter appeals *nunc pro tunc* from the September 21, 2022, judgment of sentence entered in the Court of Common Pleas of Dauphin County following his conviction at a non-jury trial on the charge of indirect criminal contempt, 23 Pa.C.S.A. § 6114, stemming from his violation of a Protection From Abuse ("PFA")[1] order.  After a careful review, we affirm.

The relevant facts and procedural history are as follows: On March 11, 2022, Kayla Flood ("the victim") filed a petition for a PFA order against Appellant, who is the father of her minor child.  On that same date, the trial

---

* Former Justice specially assigned to the Superior Court.

[1] *See* 23 Pa.C.S.A. § 6101 *et seq.*

court filed a temporary PFA order, effective March 11, 2022. On March 23, 2022, the trial court entered a final PFA order against Appellant, effective March 23, 2022, and expiring on September 23, 2022,[2] which provided:

1. [Appellant] shall not abuse, harass, stalk, threaten, or attempt to use physical force against [the victim] in any place where [she] might be found.

2. [Appellant] shall not contact [the victim], or any other person protected under this order, by telephone or by any other means, including through third persons.

3. Additional findings of this order are set forth below.

PFA order, filed 3/23/22, at 1.

In its additional findings, the trial court specifically provided **"[Appellant] may not post any remark(s) and/or images regarding [the victim], on any social network(s), including, but not limited to, Facebook, Instagram, Twitter, or any other electronic networks."** *Id.* at 3 (bold in original).

On July 13, 2022, Lower Paxton Township Police Officer Melinda Welcomer filed a criminal complaint against Appellant charging him with one count of indirect criminal contempt under 23 Pa.C.S.A. § 6114 for violation of the final PFA order. Relevantly, Officer Welcomer averred in the affidavit of probable cause:

[Appellant] did post the following on Instagram on 6/25/22 under the screen name "bklynandeverywhere." The main page has a photo of [Appellant] and has the name "Jonathan Slaughter" on

---

[2] Subsequently, on September 21, 2022, the trial court extended the final PFA order to expire on September 23, 2023.

it. The post said the following: "You get a nigga locked up who didn't hit you to end up w/ one who actually does. Karma is a bitch. I don't condone hitting women ESPECIALLY pregnant ones. Just saying when you're evil it comes back around to you."

It should be noted that [Appellant] mentioned to [the victim] at a later date about knowledge he received about [the victim] allegedly being abused by her current boyfriend. [The victim] is also pregnant.

Police Complaint, Affidavit of Probable Cause, filed 7/13/22, at 4 (capitalization in original).

On September 21, 2022, Appellant proceeded to a non-jury trial at which he was represented by counsel. At trial, the victim testified she and Appellant were in a romantic relationship "off and on" from 2013 until 2020, and they have a seven-year-old son together. N.T., 9/21/22, at 4. The victim testified she and Appellant are in an "ongoing custody case." *Id.*

The victim testified that, on July 1, 2022, at 6:30 p.m., she and Appellant were communicating on the parenting app provided for under the parties' custody order. *Id.* at 6, 8, 10. During the conversation, Appellant made "some comments about [the victim's] current boyfriend beating [her] up[.]" *Id.* at 6. Specifically, when the victim asked Appellant why their son was hungry after he had been in Appellant's care, Appellant responded their son had eaten "only once that day." *Id.* at 7. When the victim asked him why their son had eaten only once, Appellant responded their son told Appellant that the victim's "dude beat [her] in front of [their son], and [the victim] then beat [their son] for telling [Appellant about the victim's

- 3 -

business." *Id.* Appellant told the victim she should be more concerned about these incidents than about why their son had eaten only once while he was in Appellant's custody. *Id.*

The victim testified a friend subsequently told her Appellant had posted comments on his Instagram page, which is "bklynandeverywhere," and on July 13, 2022, she looked at Appellant's Instagram page. *Id.* at 6-8. She testified she knew it was Appellant's Instagram account because they had been in "some type of relationship for years, and [that had] always been his Instagram account."[3] *Id.* at 8. The victim saw comments on Appellant's social media page "referring to the incident that he had brought up between him and [the victim] on the parenting app." *Id.* at 6. Specifically, Appellant had posted the following comment: "You get a nigga locked up that hit you to end up with one who actually does. Karma is a bitch." *Id.* at 9. She noted the caption of the post indicated: "I don't condone hitting women, especially pregnant ones. Just saying when you're evil it comes back around to you." *Id.*

The victim testified that, although she did not learn of or read the comments on Appellant's Instagram account until July 13, 2022, the account reflected the comments were posted on June 25, 2022. *Id.* at 13. She noted

_____

[3] The Commonwealth also offered into evidence an exhibit, which showed a photo on Instagram under the username "bklynandeverywhere." *Id.* at 9. The victim confirmed the photo was of Appellant and his daughter. *Id.*

that during the time the comments were posted on Appellant's Instagram account, as well as at the time of trial, she was pregnant. *Id.* She also noted that in 2020 Appellant assaulted her, and he served "some jail time" in connection with the assault. *Id.* at 11-12. Accordingly, given she was pregnant, she had been the object of his previous assault resulting in his jail time, and the comments were similar to those made to her by Appellant on the parenting app, the victim concluded the post on Appellant's Instagram page was about her. *Id.* at 10-11. The victim testified she, thus, went to the police station to report Appellant's violation of the trial court's PFA order. *Id.* at 10.

On cross-examination, the victim testified she neither told Appellant that she was dating someone else nor that she was pregnant. *Id.* at 14. However, she testified that, during the July 1, 2022, parenting app communication, Appellant mentioned to her that their son had told him about the victim's pregnancy. *Id.* She noted Appellant had custody of their son prior to Appellant's posting of the comments on his Instagram account on June 25, 2022. *Id.* She also noted the last time she saw Appellant in person was on May 23, 2022, during a custody mediation proceeding, at which time her pregnancy "was showing." *Id.* at 15.

Further, on cross-examination, the victim admitted that, during the time she was romantically involved with Appellant, he mentioned a person by the name of "True" who was from New York. *Id.* at 20. However, she noted this

was "early on" in their relationship, so her memory about "True" was "vague." *Id.* at 21. She admitted Appellant's Instagram post did not mention her by name. *Id.*

Sasha Hall testified she is Appellant's current paramour. *Id.* at 22. She testified that, after elementary school closed for the summer, she began to help Appellant with the custody exchanges for his son. *Id.* at 24. Specifically, beginning in early June of 2022, she often took the child to meet the victim for custody exchanges. *Id.* She testified she neither knew nor saw evidence that the victim was pregnant in June of 2022. *Id.* She admitted that, if the victim's pregnancy had been evident to her, she would probably have told Appellant. *Id.*

On cross-examination, Ms. Hall confirmed that, beginning in June of 2022, she often met the victim in the parking lot of a grocery store to exchange custody of the child. *Id.* at 26. She admitted that both women would exit their respective vehicles during the exchanges. *Id.* She reiterated that, while she noticed the victim was "thick" or "heavyset," she did not realize this was because of a pregnancy. *Id.*

Appellant admitted he posted the comments at issue on his Instagram account. *Id.* at 31. However, he denied the comments were about the victim; but rather, he testified the comments were about True's son, Kahlil. *Id.* Specifically, he testified as follows on direct examination:

Q. There's been testimony by [the victim] that she believes [the Instagram post] was about her. Would you like to clarify for the Judge and the Court who that was actually about?

A. That was about my friend, True, who she said that she knows. Actually, it's about his son. His son was in a relationship—it's—I know True from New York. And there's a little community that we know each other; we have mutual friends and everything else. And his son was in a relationship that was kind of the neighborhood news. He was taking care of this young lady and real nice to her and everything else, and it was like it seemed like [an] ideal relationship for the most part. And then—

Q. What was his son's name?

A. Kahlil.

Q. And what happened?

A. Oh, things went sour. He got—to be—to be honest, he got caught cheating on her, and when [his girlfriend found out], she called the cops on him, got him locked up. And now the reason why I sent the post was because of the current situation is that he was with her, taking care of her, and not doing—and her daughter and everything else and treating her real good, and now she's in an abusive relationship with someone else who was driving a car and spending her money and not treating her as good as Kahlil did and actually abusing her as well.

Q. And is that young lady pregnant?

A. Yes, she is.

Q. And how did you find out about all this information?

A. Through my friend, True.

*Id.* at 31-32.

Appellant denied the comments on his Instagram page were "geared toward [the victim]." *Id.* at 32. He testified he was not aware the victim was pregnant until he was "handcuffed for this case at [his] parole agent's office, and [he] was reading the affidavit for why [he] was arrested." *Id.* He testified he pays no attention to the victim's personal relationships, except that he is

concerned since his son told him that he was afraid of the victim's boyfriend because he saw the man hit the victim. ***Id.*** at 33. He noted his son did not tell him that the victim's boyfriend hit her until after he posted the comments on Instagram. ***Id.*** Prior to this, he had no reason to believe the victim was being abused by her boyfriend. ***Id.*** at 34.

Appellant admitted he "regretfully" assaulted the victim in 2020. ***Id.*** at 37. He testified he is currently on parole for other offenses unrelated to the victim, and the victim is aware that if he is convicted of another criminal offense, his parole could be revoked. ***Id.*** at 37, 41. He suggested this is the victim's motivation in claiming the comments on Instagram are about her. ***Id.*** at 37.

On cross-examination, Appellant testified as follows:

> Q. You discussed briefly on direct this girl—it was True, gentleman, and then it was about this girl. What's that girl's name?
>
> A. Sharita.
>
> Q. How do you spell that?
>
> A. S-h-a-r-i-t-a.
>
> Q. And your testimony on direct was that this post on Instagram was directed towards this Sharita?
>
> A. Yes.
>
> Q. Are you friends with that Sharita?
>
> A. Yes. It was—it was a general post—you asked me, it was a general post just put out there for the people in the neighborhood that knew about the situation.
>
> Q. Oh, so it wasn't directed towards Sharita this time around?

A. It was, like I said, a general post to put—like I said, people in the neighborhood knew what was going on and people in—that's what it was about, yes.

Q. So you weren't trying to blast, quote unquote, Sharita?

A. The situation was so, yes.

Q. And do you follow those people from, quote unquote, the neighborhood?

A. Yeah, yes, we do follow each other.

Q. What's Drew's name?

A. True.

Q. True, what's his name?

A. Alfred Pont.

Q. Do you follow him on Instagram?

A. He doesn't really do Instagram.

Q. What about Kahlil?

A. That's his son. No, I don't follow him on Instagram.

Q. So three of the names you provided to the Court you don't follow on Instagram?

A. Yeah. Like I said—

Q. But you were just being a nice person putting out a general public service announcement?

A. It was more than just a public service announcement. Like I said, it was people in the neighborhood that—that follow the post that I was addressing.

*** 

Q. Let's talk about the post directly….So, you're saying to this Court, and I'm referencing the caption: I don't condone hitting women, especially pregnant women. Just saying when you're evil it comes back around to you.

A. Yes.

Q. That's the general public service announcement you were testifying to?

A. Yes.

Q. Not directed towards the victim?

A. Definitely not. It was directed toward Sharita and that situation because she got him locked up for infidelity.

*Id.* at 39-42.

Appellant indicated that, before he posted the comments on Instagram on June 25, 2022, he had no knowledge that the victim was pregnant or that she was allegedly being abused by her new boyfriend. *Id.* at 42.

At the conclusion of all testimony, the trial court indicated:

The Court can't set aside its common sense and reason. And despite the arguments of counsel in this matter, it's clear to me beyond a reasonable doubt that this post was directed to the victim in this case, and therefore, we'll find [Appellant] guilty on indirect criminal contempt.

*Id.* at 48.

The trial court sentenced Appellant to three months' probation and a fine of $300.00. On September 30, 2022, Appellant filed a timely, counseled post-sentence motion, which the trial court denied on October 5, 2022.[4] On November 7, 2022,[5] Appellant filed an untimely notice of appeal; however, on January 19, 2023, Appellant discontinued his appeal, and on January 20,

---

[4] We note the trial court's order summarily denied Appellant's post-sentence motion without providing Appellant with notice of his appeal rights. *See* Pa.R.Crim.P. 720(B)(4) (pertaining to the contents of an order denying a post-sentence motion).

[5] The thirtieth day to file an appeal from the denial of post-sentence motions was Friday, November 4, 2022. *See* Pa.R.A.P. 903(a).

2023, Appellant filed a timely collateral petition under the PCRA[6] seeking to have his appeal rights reinstated *nunc pro tunc*. On January 23, 2023, the court granted Appellant's petition to reinstate his appeal rights *nunc pro tunc*, and on January 26, 2023, Appellant filed the instant counseled notice of appeal. All Pa.R.A.P. 1925 requirements have been met.

On appeal, Appellant sets forth the following issue in his "Statement of Questions Presented" (verbatim):

1. Did the Commonwealth fail to establish that Mr. Slaughter acted with wrongful intent when he posted a comment without mentioning the complainant's name, there were alternative credible circumstances for the posting, and the complainant discovered the statement days after their posting?

Appellant's Brief at 6 (suggested answer omitted).

Broadly, we start from the premise that contempt convictions are reviewed for an abuse of discretion. *See Commonwealth v. Haigh*, 874 A.2d 1174, 1177 (Pa.Super. 2005). In giving latitude to the trial court's discretion, our task is to ascertain whether the facts support that court's ultimate determination. *Id*. at 1176-77.

As with any claim that contests whether there was sufficient evidence to sustain a conviction, we employ a well-settled series of legal precepts:

The standard we apply in reviewing the sufficiency of the evidence is whether viewing all the evidence admitted at trial in

---

[6] Post Conviction Relief Act ("PCRA"), 42 Pa.C.S.A. §§ 9541-46. We note the petition was filed within one year of when Appellant's judgment of sentence became final. *See* 42 Pa.C.S.A. § 9545(b)(1).

the light most favorable to the verdict winner, there is sufficient evidence to enable the fact-finder to find every element of the crime beyond a reasonable doubt. In applying [the above] test, we may not weigh the evidence and substitute our judgment for the fact-finder. In addition, we note that the facts and circumstances established by the Commonwealth need not preclude every possibility of innocence. Any doubts regarding a defendant's guilt may be resolved by the fact-finder unless the evidence is so weak and inconclusive that as a matter of law no probability of fact may be drawn from the combined circumstances. The Commonwealth may sustain its burden of proving every element of the crime beyond a reasonable doubt by means of wholly circumstantial evidence. Moreover, in applying the above test, the entire record must be evaluated and all evidence actually received must be considered. Finally, the trier of fact while passing upon the credibility of witnesses and the weight of the evidence produced, is free to believe all, part or none of the evidence.

*Commonwealth v. DiStefano*, 782 A.2d 574, 582 (Pa.Super. 2001)

(citations and quotation marks omitted).

A charge of indirect criminal contempt consists of a claim that a violation of an Order or Decree of court occurred outside the presence of the court. *Commonwealth v. Padilla*, 885 A.2d 994 (Pa.Super. 2005). "Where a PFA order is involved, an indirect criminal contempt charge is designed to seek punishment for violation of the protective order." *Id.* at 996. As with those accused of any crime, "one charged with indirect criminal contempt is to be provided the safeguards which statute and criminal procedures afford." *Id.* at 996–97 (citation omitted). To establish indirect criminal contempt, the Commonwealth must prove: 1) the Order was sufficiently definite, clear, and specific to the contemnor as to leave no doubt of the conduct prohibited; 2) the contemnor had notice of the Order; 3) the act constituting the violation must have been volitional; and 4) the contemnor must have acted with wrongful intent. *Commonwealth v. Ashton*, 824 A.2d 1198, 1202 (Pa.Super. 2003).

*Commonwealth v. Brumbaugh*, 932 A.2d 108, 110 (Pa.Super. 2007).

Here, the PFA order provided, in relevant part: **"[Appellant] may not post any remark(s) and/or images regarding [the victim], on any social network(s), including, but not limited to, Facebook, Instagram, Twitter, or any other electronic networks."** PFA Order, filed 3/23/22, at 3 (bold in original).

Appellant does not dispute the trial court's order was definite, clear, and specific to him as to leave no doubt of the conduct prohibited. *See Brumbaugh*, *supra*. He also does not dispute that he had notice of the order. *See id.* Furthermore, Appellant does not dispute that he knowingly and voluntarily posted the comments on his Instagram page. *Id.*

However, Appellant contends there is insufficient evidence his Instagram post was directed at or otherwise about the victim, who is protected by the PFA order. Rather, he contends the evidence reveals his Instagram post was about a situation involving his friend's son, Kahlil, and Kahlil's ex-girlfriend, who are not protected by the PFA order. Accordingly, he avers there is no evidence his actions violated the PFA order or that he acted with a wrongful intent in posting the comments.

In finding no merit to Appellant's sufficiency claim, the trial court indicated the following:

> The [trial] court found [the victim] and her testimony to be credible. Here testimony was corroborated by specific information contained in the social medial posts that related to events in [the victim's] life. The [trial] court did not find [Appellant] credible and was not persuaded by his argument that he was referring to a third person in his social media posts. The personal nature of the

- 13 -

information in the social medial posts and the [trial] court's assessment of the parties' testimony led it to find [Appellant] in contempt of the PFA [order].

In conclusion, this matter was determined by the credibility of the parties. The [trial] court did not find [Appellant's] explanation about his conduct to be credible. [Appellant's] conduct violated the provision of the PFA prohibiting posting about [the victim] on social media. For these reasons, the [trial] court found [Appellant] to be in indirect criminal contempt.

Trial Court Opinion, filed 1/5/23, at 2-3.

In light of the trial court's credibility determinations, which are within its purview, and viewing the evidence in the light most favorable to the Commonwealth, as verdict winner, we agree with the trial court that the evidence is sufficient to establish that Appellant's Instagram post was about the victim.

For example, Appellant and the victim were previously paramours, and they share a child. The victim testified that, as referenced in Appellant's Instagram post, during the end of their romantic relationship, the victim accused Appellant of assaulting her, and Appellant served jail time for the assault. N.T., 9/21/22, at 11-12. The victim further testified that, as referenced in Appellant's Instagram post, the victim was pregnant, and within a week of Appellant posting the comments, he admitted to the victim that he knew about her pregnancy. *Id.* at 13-14. Moreover, the victim testified that, as referenced in Appellant's Instagram post, she and Appellant had a conversation via the court's parenting app wherein Appellant made comments reflecting his belief that the victim's current boyfriend assaulted her. *Id.* at 7.

This conversation occurred less than a week after Appellant posted the comments on his Instagram page. *Id.* Accordingly, although Appellant refrained from using the victim's name, we agree with the trial court that the circumstantial evidence led to the inescapable conclusion that Appellant's comments were referring to the victim. *See DiStefano*, *supra* (setting forth standard of review for sufficiency claims).

Under such circumstances and guided by the overarching purpose of the PFA to prevent abuse, we find ample evidentiary support for the trial court's determination that Appellant possessed the wrongful intent to violate the PFA order. *Brumbaugh*, *supra*. Appellant's wrongful intent can be imputed by virtue of the substantial certainty that his posting of the comments about the victim would be in violation of the PFA order. *See Brumbaugh*, *supra*. *See also Haigh*, *supra* (holding judges should use common sense and consider context and surrounding factors in making determination as to whether violation of a PFA order is truly intentional). Thus, we reject Appellant's argument that no wrongful intent attended his Instagram comments, which were posted following the entry of the PFA order against him. Consequently, we find no merit to his sufficiency challenge.

For all of the foregoing reasons, we affirm.

Affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary


Date: <u>07/13/2023</u>