J-S18019-25

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT O.P. 65.37**

| | | |
|---|---|---|
| CHRISTINA DADEY | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| | : | |
| v. | : | |
| | : | |
| | : | |
| CARMINE JOSEPH BLOISE, JR. | : | |
| | : | |
| Appellant | : | No. 1277 WDA 2024 |

Appeal from the Order Entered October 9, 2024
In the Court of Common Pleas of Allegheny County Family Court at
No(s): FD-22-001447-007

BEFORE: DUBOW, J., NICHOLS, J., and STEVENS, P.J.E.[*]

MEMORANDUM BY NICHOLS, J.: **FILED: September 24, 2025**

Appellant Carmine Joseph Bloise, Jr. (Father) appeals *pro se* from the order holding him in indirect criminal contempt (ICC) for violating an order filed pursuant to the Protection From Abuse (PFA) Act.[1,2] Father challenges

_____

[*] Former Justice specially assigned to the Superior Court.

[1] 23 Pa.C.S. §§ 6101-6122.

[2] On February 28, 2025, this Court remanded this matter to the trial court for a hearing pursuant to **Commonwealth v. Grazier**, 713 A.2d 81 (Pa. 1998), to determine whether Father knowingly, voluntarily, and intelligently waived his right to counsel. **See** Order, 2/28/25 (citing **Grazier**; 23 Pa.C.S. § 6114(b)(3) (stating "[t]he defendant shall not have a right to a jury trial on a charge of ICC. However, the defendant shall be entitled to counsel.")). On March 3, 2025, the trial court filed an order stating that Father made a knowing, voluntary, and intelligent waiver of his right to counsel. **See** Trial Ct. Order, 3/3/25. On March 20, 2025, this Court filed an order acknowledging that the trial court held a **Grazier** hearing and that Father was granted leave to proceed *pro se*. **See** Order, 3/20/25.

the trial court's jurisdiction in this matter, claims the trial court erred in accepting improperly submitted video evidence, and argues the evidence was insufficient to convict him of ICC. After review, we affirm.

The record reflects that Father and Appellee Christina Dadey (Mother) are the parents of A.B. (Child), who was born in March of 2019, and the underlying proceedings began as a child custody case. A prior panel of this Court provided a thorough account of Mother's testimony summarizing the relevant facts and procedural history in the underlying child custody and PFA matter as follows:

> The parties met in January of 2018. Mother became pregnant. Subsequently the parties began living with one another in August of 2019 where they also share[d] their residence with [J.B.], [Father's] other daughter from a prior relationship. . . .
>
> The longer that [Mother] was living with [Father,] she began noticing emotionally abusive behavior, including controlling, erratic and unstable actions. Unfortunately this did escalate to physical abuse which included pushing, shoving, choking, scratching, refusing to let her leave the residence without his permission and the like. Despite this abuse [Mother] did try to work with [Father] and go through couple's therapy.
>
> On July 29, 2022, after a very intense argument with [Father], it resulted in him choking and shoving [Mother]. And at that point in time she realized that she needed to end the relationship. Following this argument[, Mother] went to [sic] a family vacation with both [Child] and [J.B.]. Mother and [Father] had agreed [Father] was to move out of the residence when [Mother] had returned from vacation. On August 6, 2022[, Mother] did return from the vacation with both children.
>
> *   *   *
>
> [Mother] eventually did drive to the residence following this vacation to see if [Father] had moved out. Initially she believed him to have been gone, but he was actually hiding down the block

in his car. When she approached the residence, [Father] did open the door, grab [Mother, and] forcibly pulled her inside. There was an immediate struggle. Father grabbed [Mother's] cell phone from her hand to prevent her from calling for help. She was stuck in there with him for approximately three hours as he was trying to or as he was threatening to kill himself and also threatened [Mother] with violence, which he ultimately followed through with when she tried leaving the residence. At that point he did push her to the bed and with a closed-fisted hand, punched her in the head. Eventually [Father] did give [Mother] her phone back and she was able to leave the residence.

\* \* \*

So on August 8, 2022[, Mother] did file a PFA, Protection from Abuse [petition]. A Temporary PFA Order was entered the same day evicting [Father] from the residence and awarding [Mother] primary physical custody of [Child] subject to [Father's] supervised partial custody – physical custody. A Final Order was later entered on August 18 by consent of the parties granting [Father] partial physical custody of [Child] once he obtained his own residence. It was explicitly clear that he was not supposed to contact [Mother] directly or indirectly, not abuse, stalk, harass or attempt to threaten physical force against her.

For approximately seven months following this PFA [Mother] primarily took care of both [Child and J.B.], whom she has no legal rights or custody over. That was from August of 2022 through March of 2023. Over that seven-month period [Father] left both children with [Mother], and over that period of time [Mother] alleges he only visited approximately five times over that seven-month period for both of his children.

\* \* \*

On November 2, 2022, a general continuance order was entered extending the Final PFA Order until August 8, 2025. Father was provided with partial custody of [Child] every other weekend at that time.

\* \* \*

On June 8[, 2024] [Child] had her dance recital. . . . This was the subject of the indirect criminal contempt hearing which would later occur . . . on October 9, 2024. During this incident [Mother] was informed by [Child] that [J.B.] was left at home alone for two to

- 3 -

three hours. [J.B.] has autism, and I believe it is severe autism. When [Father] returned to the recital or at that point in time a welfare check was called by [Mother]. Father had indicated that his reasoning for leaving [J.B.] behind was because [J.B.] had asked him and she had no problem with this. Mother pleaded with [Father] that he go get [J.B.] and bring her to the dance recital. He refused. She even offered to help with this. He refused. . . .

***Bloise v. Dadey***, 1582 WDA 2024, 2025 WL 1835921, at *1-2, *4 (Pa. Super. filed July 3, 2025) (citing N.T. Hr'g, 11/20/24, at 8-39) (***Bloise I***);[3] ***see also*** N.T. Hr'g, 10/9/24, at 10-14 (summarizing the history of the custody and PFA matters).

At the ICC hearing on October 9, 2024, Mother further testified about what occurred at Child's dance recital. The PFA order remained in effect, and Father was to have no contact with Mother. However, Mother explained that for this dance recital, the trial court filed an order on March 26, 2024, providing that both Mother and Father were permitted to attend because Father had custody that weekend. Mother testified that the trial court ordered that "Father is to take [Child] to the dance recital. [Mother] may attend and assist [Child] in preparation. Both parents shall attend and sit on opposite sides of the room." ***See*** N.T. Hr'g, 10/9/24, at 15; Trial Ct. Order, 3/26/24. However, at the dance recital, when Mother learned through Child that Father had left J.B. home alone, Mother testified that she sent Father a message through the "Our Family Wizard" system (the Wizard). Mother noted her

---

[3] We note that the transcripts from the November 20, 2024 hearing that were cited by the prior panel of this Court in the earlier appeal are included in the certified record in the instant appeal. ***See*** N.T. Hr'g, 11/20/24.

concern that Father left J.B., who was an eight-year-old with autism, alone at Father's house during Child's dance recital. Mother's message to Father through the Wizard said: "Please go get [J.B.]. I can have somebody -- I can get her or have someone get her. Please. This is not safe." N.T. Hr'g, 10/9/24, at 18. Father disregarded Mother's request, and Mother called 911 for a welfare check on J.B. *See id.* at 20.

Mother testified that Father learned that she called for a welfare check on J.B., and Father left the dance recital. Father drove home and returned to the dance recital with J.B. Mother tried to leave the recital in order to avoid any contact with Father. However, when he returned to the dance recital, Father approached Mother directly and in a "hostile and aggressive demeanor." *Id.* at 21. Father began screaming at Mother about calling for a welfare check on J.B., and Mother testified that Father was harassing her and that she felt threatened by Father's actions toward her. *Id.* at 22.

Mother introduced a video of Father's behavior at the recital, and the record reflects that the video was admitted into evidence. *See id.* at 22-24; Index of Exhibits, ICC Hearing, 10/9/24. Regarding the video of Father's actions, Mother testified that Father continued to yell at her, and "[t]hat's all I got in the video." N.T. Hr'g, 10/9/24, at 24. Mother then said that she tried to get away from Father. *See id.* at 26. Police ultimately arrived at the school where the dance recital was held, and Father left in his car. Mother testified that a criminal complaint was filed against Father, and Father was charged with disorderly conduct, fleeing and eluding, endangering the welfare of a

child, and multiple moving violations which included failing to stop at stop signs or yield to emergency vehicles. *See id.* at 26-29. Mother testified that Father did not turn himself in to police for approximately two weeks. *See id.* at 26-33.

At the conclusion of the hearing, the trial court found Father in ICC and imposed a $750 fine. *See* Trial Ct. Order, 10/9/24. The trial court also extended the PFA through August 18, 2028. *See id.* On October 16, 2024, Father filed a timely notice of appeal and a concise statement of errors complained of on appeal pursuant to Pa.R.A.P. 1925(a)(2)(i) and 1925(b).[4] The trial court filed an opinion responding to the issues Father raised in his concise statement.

On appeal, Father presents the following issues, which we have renumbered as follows:

1. Did the trial court improperly exercise jurisdiction after [Father] initiated appellate proceedings on September 26, 2024?

---

[4] Father acknowledges that the trial court did not order him to file a concise statement of errors complained of on appeal. *See* Father's Brief at 92. However, Father explained that he filed a Rule 1925(b) statement with his notice of appeal because he asserted that this matter qualified as a Children's Fast Track appeal and required the inclusion of the Rule 1925(b) statement with the filing of the notice of appeal pursuant to Pa.R.A.P. 1925(a)(2)(i). *See id.* at 92-93. On October 10, 2024, this Court filed an order informing Father that this matter was an appeal from ICC, and that it did not qualify as a Children's Fast Track appeal under Pa.R.A.P. 102. *See* Order, 10/29/24. Nevertheless, Father emphasized that he did file a Rule 1925(b) statement. *See* Father's Brief at 93.

2. Did the trial court commit procedural error by accepting last-minute, improperly submitted evidence from [Mother], thereby denying [Father] a fair opportunity to review and contest this evidence, and denying [Father's] motion to strike improperly submitted evidence? . . .

3. Did the trial court apply an incorrect legal standard in finding [Father] guilty of indirect criminal contempt, failing to prove beyond a reasonable doubt that the violation was volitional, and that [Father] acted with wrongful intent?

4. Did the trial court's reliance on alleged "flight" from the scene, which [Appellant] specifically had sought to exclude, treated as a fact rather than an allegation, constitute a fundamental error affecting the fairness of the proceedings and the integrity of the court's findings?[5]

Father's Brief at 5-7 (some formatting altered).[6]

---

[5] Although Father's Rule 1925(b) statement does not specifically allege that the trial court erred in considering Father's flight to avoid the police, Father's Rule 1925(b) statement did mention a pretrial motion *in limine*, in which Father sought to preclude the trial court from considering his flight, and the trial court denied this motion. The trial court briefly addressed Father's flight in its Rule 1925(a) opinion, and we conclude that the issue was "fairly suggested" by the issues raised in Father's Rule 1925(b) statement. ***See FedEx Corporate Servs., Inc. v. Costume Gallery, Inc.***, 320 A.3d 129, 135 (Pa. Super. 2024) (stating "[u]nder Pa.R.A.P. 2116(a), a '[1925(b)] statement will be deemed to include every subsidiary question fairly comprised therein . . . or fairly suggested thereby'"). Accordingly, we will not deem this issue waived for failing to include it in the Rule 1925(b) statement.

[6] In his appellate brief, Father also presented additional issues arguing that Mother's former counsel acted improperly and as a prosecutor at Father's contempt hearing and that Mother's former counsel should face sanctions, the trial court erred in admitting excerpts from a police report without proper authentication under the Uniform Business Records as Evidence Act (42 Pa.C.S. § 6108), and Father also asserts that his own prior counsel was ineffective. ***See*** Father's Brief at 5-7. None of these issues were raised in Father's Rule 1925(b) concise statement of errors complained of on appeal. Although not ordered to do so by the trial court, because Father did file a Rule 1925(b) statement, but did not specify these additional issues, they are
*(Footnote Continued Next Page)*

**Jurisdiction**

In his first claim, Father argues that the trial court was divested of jurisdiction pursuant to Pa.R.A.P. 1701(a) once Father filed an appeal from an order at the underlying trial court docket on September 26, 2024. *See id.* at 56-63.

A challenge to a court's subject matter jurisdiction presents a question of law, and our review is *de novo*. *See Commonwealth v. Jones*, 929 A.2d 205, 211 (Pa. 2007).

Here, the record reflects that Father raised an identical claim concerning jurisdiction in *Bloise I* in which he argued that his September 26, 2024 notice of appeal divested the trial court of jurisdiction. *See Bloise I*, at *7. However, the *Bloise I* Court concluded that Father's September 26, 2024 notice of appeal was taken from a non-appealable, interlocutory order and did not divest the trial court of jurisdiction. *See id.* at *8 (citing Pa.R.A.P. 1701(b)(6)). We note that the law of the case doctrine holds that "a court involved in the later phases of a litigated matter should not reopen questions

waived on appeal. *See Commonwealth v. Sanchez*, 262 A.3d 1283, 1290 n.8 (Pa. Super. 2021) (explaining that if the trial court does not order the appellant to file Rule 1925(b) statement, but the appellant files a Rule 1925(b) statement voluntarily, the appellant is limited on appeal to arguing only the issues presented in the voluntarily filed Rule 1925(b) statement); *Mullen v. Donnelly*, 2255 EDA 2022, 2024 WL 493562, at *2 (Pa. Super. filed Feb. 2, 2024) (unpublished mem.) (stating that "[w]here an appellant fails to raise an issue in a Rule 1925(b) statement, the issue is waived for the purpose of th[e] appeal. This rule of waiver applies even if the trial court did not order the appellant to file a Rule 1925(b) statement" (citations omitted)); *see also* Pa.R.A.P. 126(b) (providing that we may cite to non-published decisions of this Court filed after May 1, 2019 for their persuasive value).

decided by another judge of that same court or by a higher court in the earlier phases of the matter." **Commonwealth v. Starr**, 664 A.2d 1326, 1331 (Pa. 1995) (citations omitted). Accordingly, because the **Bloise I** Court concluded that Father's September 26, 2024 notice of appeal was interlocutory and did not divest the trial court of jurisdiction to proceed further in this matter, it is the law of the case, and Father is not entitled to relief. **See Bloise I**, at *8.

In any event, even if the **Bloise I** Court had not already determined that the September 26, 2024 appeal did not divest the trial court of jurisdiction, we would reach the same conclusion here. The filing of an interlocutory appeal from a non-final order does not divest the trial court of jurisdiction under Rule 1701. Rule 1701 states that "[e]xcept as otherwise prescribed by these rules, after an appeal is taken or review of a quasijudicial order is sought, the trial court or other government unit may no longer proceed further in the matter." Pa.R.A.P. 1701(a). However, the Rule specifically states that the trial court may "[p]roceed further in any matter in which a non-appealable interlocutory order has been entered, notwithstanding the filing of a notice of appeal or a petition for review of the order." Pa.R.A.P. 1701(b)(6); **see also Dovin v. Honey Brook Golf Club L.P.**, 325 A.3d 1282, 1289 (Pa. Super. 2024) (stating that "an appeal taken from any non-appealable interlocutory order does not divest a trial court of jurisdiction to proceed further in the matter" (citing, *inter alia*, Pa.R.A.P. 1701(b)(6)). Accordingly, even if this issue had not been decided in **Bloise I** and become the law of the case, because the September 26, 2024 appeal was

interlocutory, the trial court did not lose jurisdiction. ***See*** Pa.R.A.P. 1701(b)(6). Father's claim that the trial court was divested of jurisdiction is meritless, and Father is not entitled to relief.

### Evidentiary Ruling

Next, Father argues that the trial court erred by accepting last-minute and improperly submitted video evidence from Mother. ***See*** Father's Brief at 79. Father contends that the trial court erred because the video evidence was submitted via email the day before the ICC hearing, and Father notes that he filed a motion to strike the video, which the trial court denied. ***See id.*** at 79-81.[7]

Upon review, we conclude that Father has failed to establish how the trial court committed reversible error by accepting the video file or denying the motion to strike. As the trial court pointed out, Father received the video prior to the hearing. ***See*** Trial Ct. Op., 11/12/24, at 5.

Further, to the extent that Father is attempting to claim that there was a discovery violation, Father has failed to develop that claim in his brief or explain how an alleged violation of the discovery rule under Pa.R.Crim.P. 573(E) would entitle him to relief.[8] Although this Court is willing to liberally

_____

[7] In his Rule 1925(b) statement, Father also asserted that the submission of the video evidence was an *ex parte* communication. ***See*** Rule 1925(b) Statement, 10/16/24, at 6. Father has abandoned this claim on appeal.

[8] It is well settled that "[a] defendant seeking relief from a discovery violation must demonstrate prejudice" and that "[a] violation of discovery does not
*(Footnote Continued Next Page)*

- 10 -

construe materials filed by a *pro se* litigant, *pro se* status confers no special

benefit.[9]  "This Court will not act as counsel and will not develop arguments

_____

automatically entitle [an] appellant to a new trial." ***Commonwealth v. Brown***, 200 A.3d 986, 993 (Pa. Super. 2018) (citations omitted and formatting altered).  "Rather, an appellant must demonstrate how a more timely disclosure would have affected his trial strategy or how he was otherwise prejudiced by the alleged late disclosure." ***Id.*** (citation omitted).  As discussed above, the video at issue was a recording of Father's actions and behavior at Child's dance recital, and Father has failed to establish how he was unduly prejudiced by this evidence.

Additionally, we note that although a PFA proceeding is criminal in nature, it does not receive all of the protections that regular criminal proceedings receive.  ***See Commonwealth v. Marks***, 268 A.3d 457, 459 (Pa. Super. 2021).  Unlike criminal defendants, "a contemnor under the PFA has no right to a preliminary hearing or jury trial," as "the PFA Act was meant to address spousal and child abuse, and its goal is to prevent future abuse rather than impose punishment for past abuse.  Thus, the imposition of sanctions for contempt rests within the court's inherent power to enforce its orders." ***Id.*** (citations omitted).  "Unless otherwise specifically provided, [the Rules of Criminal Procedure] shall not apply to juvenile or domestic relations proceedings."  Pa.R.Crim.P. 100(A).  Additionally, we note that Pa.R.Crim.P. 573 is a rule of criminal procedure and "is intended to apply only to court cases[,]" ***see*** Pa.R.Crim.P. 573 cmt., which include cases "in which one or more of the offenses charged is a misdemeanor, felony, or murder of the first, second, or third degree."  Pa.R.Crim.P. 103.  Therefore, even if Father cited Pa.R.Crim.P. 573 in his brief, that rule does not apply.

[9] It is well settled that *pro se* status does not relieve Father of his duty to follow the Rules of Appellate Procedure. ***See Commonwealth v. Vurimindi***, 200 A.3d 1031, 1037 (Pa. Super. 2018).

> Although this Court is willing to liberally construe materials filed by a *pro se* litigant, *pro se* status confers no special benefit upon the appellant.  To the contrary, any person choosing to represent himself in a legal proceeding must, to a reasonable extent, assume that his lack of expertise and legal training will be his undoing. ***In re Ullman***, 995 A.2d 1207, 1211-1212 (Pa. Super. 2010).  Accordingly, *pro se* litigants must comply with the

*(Footnote Continued Next Page)*

on behalf of an appellant." ***Commonwealth v. Westlake***, 295 A.3d 1281, 1286 n.8 (Pa. Super. 2023) (citation omitted and formatting altered). Indeed, we will "not develop an argument for an appellant, nor shall we scour the record to find evidence to support an argument; instead, we will deem the issue to be waived." ***Commonwealth v. Pi Delta Psi, Inc.***, 211 A.3d 875, 884-85 (Pa. Super. 2019) (citations omitted). Because Father has failed to develop an argument with citations to the record and relevant legal authority, Father's challenge to the trial court accepting the video and challenge to the order denying his motion to strike is waived. ***See id.***; Pa.R.A.P. 2119(c).

### Legal Standard

Next, Father argues that the trial court applied an incorrect legal standard in finding him in ICC, and he asserts that the evidence did not establish that his violation of the PFA was volitional and made with wrongful intent. ***See*** Father's Brief at 87-88.

> We review a contempt conviction for an abuse of discretion. We rely on the discretion of the trial court judge and are confined to a determination of whether the facts support the trial court's decision. In reviewing whether the evidence was sufficient to support the conviction, we must determine whether the evidence admitted at trial, and all reasonable inferences drawn from that evidence, when viewed in the light most favorable to the Commonwealth as verdict winner, was sufficient to enable the fact finder to conclude that the Commonwealth established all of the

> procedural rules set forth in the Pennsylvania Rules of Court; if there are considerable defects, we will be unable to perform appellate review.

***Id.*** at 1037-38 (citation omitted and some formatting altered).

elements of the offense beyond a reasonable doubt. In applying the above test, we may not weigh the evidence and substitute our judgment for the fact-finder. Finally, the trier of fact[,] while passing upon the credibility of witnesses and the weight of the evidence produced, is free to believe all, part or none of the evidence.

This Court has repeatedly stated that "[t]he purpose of the PFA Act is to protect victims of domestic violence from those who perpetrate such abuse, with the primary goal of advance prevention of physical and sexual abuse." Where a PFA order is involved, an indirect criminal contempt charge is designed to seek punishment for violation of the protective order. A charge of indirect criminal contempt consists of a claim that a violation of an order occurred outside the presence of the court.

In order to establish indirect criminal contempt, the Commonwealth must prove: 1) the order was sufficiently definite, clear, and specific to the contemnor as to leave no doubt of the conduct prohibited; 2) the contemnor had notice of the order; 3) the act constituting the violation must have been volitional; and 4) the contemnor must have acted with wrongful intent.

*Commonwealth v. Felder*, 176 A.3d 331, 333-34 (Pa. Super. 2017) (citations omitted and some formatting altered).

This Court has further explained: "[i]t is imperative that trial judges use common sense and consider the context and surrounding factors in making their determinations of whether a violation of a court order is truly intentional before imposing sanctions of criminal contempt." *Commonwealth v. Haigh*, 874 A.2d 1174, 1177 (Pa. Super. 2005) (some formatting altered). Additionally, in ICC matters, a defendant's "wrongful intent can be imputed by virtue of the substantial certainty that" the defendant's actions would bring the defendant into contact with the protected party in violation of the PFA

order. ***Commonwealth v. Brumbaugh***, 932 A.2d 108, 111 (Pa. Super. 2007).

> The trial court addressed this issue as follows:

> [Father] claims that the evidence failed to establish that he acted volitionally. First, he claims that the order was not "definite or specific regarding the prohibited conduct." This claim is frivolous. The PFA Order was the standard form order issued in PFA matters. It stated, very specifically, what was prohibited. [Father's] conduct, as established by the evidence presented at the hearing, clearly showed that he violated the order. His further contention that the evidence did not prove he acted volitionally is belied by the evidence. I concluded that he did act with the required intent in violating the [PFA] order, notwithstanding his claims to the contrary. It was my job to assess credibility, and I found Father to not be credible.

Trial Ct. Op., 11/12/24, at 6-7.

As noted, the PFA order directed that Father "shall not abuse, stalk, harass, threaten, or attempt to threaten to use physical force against [Mother]." PFA Order, 8/18/22, at 2 (some formatting altered). Further, except to communicate regarding custody, Father was ordered that he "shall not contact [Mother] . . . either directly or indirectly[.]" ***Id.*** (some formatting altered). As discussed above, because Child had a dance recital, the trial court permitted both Mother and Father to attend, but the trial court ordered that Mother and Father "shall attend and sit on opposite sides of the room." Trial Ct. Order, 3/26/24.

The record reflects that the final PFA order was entered by consent of the parties, and Father does not allege that he did not have notice of the PFA order. ***See*** PFA Order, 8/18/22, at 2. Further, Father does not dispute that

he had notice of the March 26, 2024 order concerning the dance recital, and Father's counsel conceded this point at the October 9, 2024 hearing. *See* Trial Ct. Order, 3/26/24; N.T. Hr'g, 10/9/24, at 45. Despite having notice of the PFA order, Father contacted Mother directly during Child's dance recital, and Mother testified that Father was harassing and threatening her in direct violation of the PFA order and the March 26, 2024 order concerning the dance recital. *See* N.T. Hr'g, 10/9/24, at 22. The trial court credited Mother's testimony, found that Father's version of events was not credible, and concluded that Father was in ICC. *See* N.T. Hr'g, 10/9/24, at 47; Trial Ct. Op., 11/12/24, at 6-7. After review, we discern no error of law or abuse of discretion in the trial court's conclusion that all of the elements of ICC were satisfied. *See Felder*, 176 A.3d at 333-34; Trial Ct. Op., 11/12/24, at 6-7.

For these reasons, we conclude that the trial court applied the correct legal standard and conclude that the evidence established that Father was in indirect criminal contempt of the PFA order. *See Felder*, 176 A.3d at 333-34; *Haigh*, 874 A.2d at 1177; *Brumbaugh*, 932 A.2d at 111. Therefore, Father is not entitled to relief on this issue.

**Flight**

In his final claim, Father contends that the trial court erred by considering his flight from Child's dance recital. *See* Father's Brief at 66-72. Although Father's Rule 1925(b) statement does not mention the trial court's consideration of his flight from the scene of Child's dance recital, it does mention a motion *in limine*. *See* Rule 1925(b) Statement, 10/16/24, at 5-6;

Mot. in Limine, 9/23/24. In this motion *in limine*, Father sought to, among other things, preclude the trial court from considering his flight based on the Pennsylvania Rules of Evidence. **See** Mot. *in Limine*, 9/23/24, at 2-3. In its opinion, the trial court briefly addressed its consideration of Father's flight from Child's dance recital. **See** Trial Ct. Op., 11/12/24, at 4-5. In his appellate brief, Father now contends that the trial court violated his Fifth and Fourteen Amendment protections by considering "unadjudicated criminal charges in another court." Father's Brief at 68. Father then proceeds to address evidence of flight jury instructions and claims that the trial court's verdict is tied to a corrupt source. **See id.** at 68-72.

Father raised the flight issue in his Rule 1925(b) statement, and in its opinion, the trial court concluded that it was not error to consider flight, however, the arguments Father now raises on appeal concerning constitutional protections and jury instructions were not raised before the trial court nor mentioned in his Rule 1925(b) statement. Moreover, Father's argument contains bald assertions, and unsupported conclusions. As we have noted, this Court will not act as counsel nor develop an argument for an appellant. **See Pi Delta Psi, Inc.**, 211 A.3d at 884-85. Accordingly, we conclude that this claim is waived.[10] **See id.**

_____

[10] In any event, there was overwhelming evidence that Father directly approached Mother at the dance recital and harassed her causing her to feel threatened in direct violation of the PFA order. **See** N.T. Hr'g, 10/9/24, at 22. The trial court credited Mother's testimony concerning Father's actions, found
*(Footnote Continued Next Page)*

After review, we conclude that Father's appellate issues were either waived or lack merit, and he is not entitled to relief. Accordingly, we affirm.

Order affirmed. Jurisdiction relinquished.

Judgment Entered.

Benjamin D. Kohler, Esq.
Prothonotary

DATE: 9/24/2025

---

Father's version of events not credible, and found Father in ICC. **See** N.T. Hr'g, 10/9/24, at 47; Trial Ct. Op., 11/12/24, at 6-7. Even if Father's flight from the dance recital was not considered by the trial court, other evidence presented, including Mother's testimony and the video, proved Father violated the PFA order.