J-S26015-22

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| | : | |
| v. | : | |
| | : | |
| | : | |
| WILLIAM DISLA-OTERO | : | |
| | : | |
| Appellant | : | No. 302 MDA 2022 |

Appeal from the Judgment of Sentence Entered January 13, 2022,
in the Court of Common Pleas of Luzerne County,
Civil Division at No(s): 2021-12690.

BEFORE:   KUNSELMAN, J., McCAFFERY, J., and STEVENS, P.J.E.[*]

MEMORANDUM BY KUNSELMAN, J.:              **FILED:  OCTOBER 28, 2022**

Appellant William Disla-Otero appeals from his judgment of sentence of six months' probation following his conviction of indirect criminal contempt for violating a Temporary Protection From Abuse Order, pursuant to the Protection of Abuse (PFA) Act.  **See** 23 Pa.C.S.A. §§ 6102-6122.   After review, we conclude the trial court did not abuse its discretion when it determined that Appellant acted with the requisite wrongful intent.  We affirm.

Relevant history begins on November 10, 2021, when the Lackawanna County Court of Common Pleas[1] granted the petition of Coryvette Olivio to

_____

[*] Former Justice specially assigned to the Superior Court.

[1] The Temporary PFA Order was issued in Lackawanna County, the violation occurred in Luzerne County.  Thus, the contempt hearing was held before the Luzerne County Court of Common Pleas.

obtain a Temporary PFA Order, pursuant to the Protection From Abuse (PFA) Act, against Appellant. According to the Temporary PFA Order, the Appellant and Olivio share a child together. The Temporary PFA Order directed that Appellant shall not abuse, harass, stalk, threaten or attempt to threaten to use physical force against Olivio. The Order further directed that Appellant shall not contact Olivio *via* third persons.[2]

The precise circumstances surrounding Appellant's violation of the Temporary PFA Order are critical to our decision. But for now, this overture suffices: On the morning of December 17, 2021, Appellant went to get a haircut. The barber told Appellant that there was a wait, so the Appellant went to a nearby bakery to get something to eat. Olivio happened to be in the bakery. According to Appellant, he did not immediately recognize Olivio because her back was to the door. But Appellant did notice Olivio's boyfriend, who, according to Appellant, immediately started staring at Appellant and initiated a verbal altercation. *See* Appellant's Brief at 8. The verbal altercation got everyone kicked out of the bakery. At Olivio's direction, the bakery called 911. Appellant was arrested for violating the Temporary PFA Order. The trial court subsequently convicted Appellant and sentenced him to a six-month period of probation. The court further ordered Appellant to complete an evaluation to determine whether he would benefit from an anger management course.

_____

[2] The final PFA hearing was scheduled for May 2022.

Appellant timely filed this appeal. He presents the following issues for our review:

1. [Whether the] evidence presented was equally connected with contact between [Appellant] and the purported victim not being intended, but coincidental[?]

2. [Whether the] evidence presented was equally connected with the purported victim intentionally inducing and provoking any adverse contact[?]

Appellant's Brief at 1.

In his Brief, Appellant collapses these issues to make one argument. He asks whether the trial court erred when it determined that Appellant acted with the requisite "wrongful intent." *See generally id.* at 4, 5-10.

With the contours of Appellant's appeal understood, we answer this question by first observing our well-settled standard of review:

> Our standard of review in assessing whether sufficient evidence was presented to sustain [an a]ppellant's conviction is well-settled. The standard we apply in reviewing the sufficiency of the evidence is whether viewing all the evidence admitted at trial in the light most favorable to the verdict winner, there is sufficient evidence to enable the fact-finder to find every element of the crime beyond a reasonable doubt.
>
> In applying [this] test, we may not weigh the evidence and substitute our judgment for the fact-finder. In addition, we note that the facts and circumstances established by the Commonwealth need not preclude every possibility of innocence. Any doubts regarding a defendant's guilt may be resolved by the fact-finder unless the evidence is so weak and inconclusive that as a matter of law no probability of fact may be drawn from the combined circumstances. The Commonwealth may sustain its burden of proving every element of the crime beyond a reasonable doubt by means of wholly circumstantial evidence. Moreover, in applying the

above test, the entire record must be evaluated and all evidence actually received must be considered. Finally, the trier of fact while passing upon the credibility of witnesses and the weight of the evidence produced, is free to believe all, part or none of the evidence.

*Commonwealth v. Boyer*, --A.3d --, 2022 WL 4100428, at *8 (Pa. Super. September 8, 2022) (quoting *Commonwealth v. Brumbaugh*, 932 A.2d 108, 109-10 (Pa. Super. 2007)) (further citations omitted).

The PFA Act permits a court to hold an individual subject to a protection order in contempt of such order and to punish the defendant in accordance with the law. *See* 23 Pa.C.S.A. § 6114(a). To establish indirect criminal contempt, the Commonwealth must prove four elements:

> (1) the order was sufficiently definite, clear, and specific to the contemnor as to leave no doubt of the conduct prohibited;
>
> (2) the contemnor had notice of the order;
>
> (3) the act constituting the violation must have been volitional; and
>
> **(4) the contemnor must have acted with wrongful intent.**

*Boyer*, --A.3d --, at *8 (Pa. Super. September 8, 2022) (citing *Commonwealth v. Walsh*, 36 A.3d 613, 618-19 (Pa. Super. 2012)) (further citations omitted) (emphasis added).

Appellant concedes that the Commonwealth established the first three elements. He limits his appeal to fourth element, which concerns the scienter requirement.

- 4 -

This Court has held that "[w]rongful intent will be found where the contemnor knows or reasonably should be aware that his conduct is wrongful." **Boyer**, ---A.3d---, at *9 (citations omitted). Wrongful intent can also be inferred if the Appellant's act had a substantial certainty of being in violation of the order. **Id.** (citing **Brumbaugh**, 932 A.2d at 110). "It is imperative that trial judges use common sense and consider the context and surrounding factors in making their determinations of whether a violation of a court order is truly **intentional** before imposing sanctions of criminal contempt." **Commonwealth v. Haigh**, 874 A.2d 1174, 1177 (Pa. Super. 2005), *appeal denied*, 887 A.2d 1240 (Pa. 2005) (emphasis in original).

To be sure, not all contact with a protected party necessarily rises to the level of indirect criminal contempt. In **Haigh**, for instance, the criminal defendant, while shackled in a courtroom, leaned over to his wife (the protected party) to ask her for any updates on her cancer prognosis. **Haigh**, 874 A.2d at 1176. We vacated the sentence, because "the record [did] not support the determination that Appellant intended to violate the final PFA order **and** because the infraction was both *de minimis* and non-threatening[;]" the defendant thought he could speak to the wife, because they were in a courtroom, and the wife testified she did not feel threatened. **Id.** at 1178 (emphasis original).

In this case, Appellant argues that there was insufficient evidence to establish his wrongful intent. He argues that he went into the bakery for food, and then left "almost immediately" after "being accosted by Olivio and her

- 5 -

boyfriend." **See** Appellant's Brief at 8. Appellant argues further that Olivio and her boyfriend followed **him** outside, despite the fact that Olivio was also subject to a PFA order – one that Appellant had obtained against her. Lastly, Appellant takes issue with the trial court's admonishment that all Appellant "had to do was turn around and leave;" Appellant maintains that's exactly what he tried to do. **Id.** at 9.

Critically, Appellant casts these facts in a light most favorable to him. But that is not the standard by which we review his conviction on appeal. We review the facts in a light most favorable to Olivio, since she prevailed before the trial court. We do not re-weigh the evidence or substitute our judgment for that of the trial court. And we reiterate that the trial court, when weighing the evidence and determining the facts, is free to believe all, part, or none of the evidence. **Boyer**, **supra**. With these principles in mind, we review the court's findings.

> Olivio testified that she was in the bakery for ten minutes when Appellant entered the bakery with two other men [(friends of Appellant)]. Olivio testified that when the Appellant was inside the bakery, he began looking at her, approached her, stood close to her face and was looking at her. Olivio proceeded to tell the Appellant that he was not permitted to be around her. Olivio claimed that Appellant responded "ain't nobody around you." Olivio testified that Appellant was "calling her names" and remained standing in the bakery. Olivio then testified that Appellant's friends came up close to her face and told her to "watch her mouth" among other things. Olivio then testified that subsequent to the Appellant and his friends refusing to leave the bakery, Olivio told the bakery staff to call 911, a request to which the staff complied.

Olivio testified that she recorded the incident as a video on her cell phone. [The trial court] and the attorneys involved viewed the recorded video in the courtroom during the hearing. Further, Mr. James Conmy testified that he is a detective with the Wilkes-Barre City Police Department. He indicated that he responded to a call involving an alleged protection from abuse violation at [the] bakery[.] Upon his arrival, Olivio showed him the recorded video of the exchange between her and the Appellant. The detective testified that he also viewed the secured video footage from both inside and outside of the bakery on the date and at the time at issue.

The Appellant's friend, Nicholas Torres, testified that after he, the Appellant and another friend entered the bakery, they saw Olivio. He claimed that Olivio told them that they were not supposed to be in the bakery and that he (Torres), attempted to get everyone to leave the premises. According to Torres, after Olivio told everyone that they were not supposed to be in the bakery near her, the Appellant remained in the bakery less than two minutes and then left the premises.

Furthermore, the Appellant testified that he went inside the bakery with his friends not knowing that Olivio was inside. The Appellant claimed that once he was inside, he saw Olivio's boyfriend and that the boyfriend started arguing with Appellant. He stated that Olivio turned around and told him that he was not supposed to be around her in the bakery. The Appellant testified that he told Olivio that he did not know that she was in the bakery. Appellant testified that a verbal altercation broke out; the bakery employees asked them to leave and they did leave. Upon cross-examination, Appellant was asked as to whether he called Olivio a "bitch." Appellant responded that he did not recall. He further stated that he did not speak to her at first. Appellant admitted upon cross-examination that when he entered the bakery, he saw that Olivio was inside the bakery. The recorded video [FN 2] presented by Olivio reflected Olivio telling Appellant that he was not supposed to be in the bakery at the same time as he and was not supposed to be around her.

  FN 2: The recorded video presented by the Commonwealth, the Appellee, was summarized by

> Appellee's counsel without any objection to the summary from Appellant's counsel.
>
> Appellant then proceeded to call Olivio degrading names. Appellant continued to talk about seeing Olivio's vehicle outside, calling Olivio names and engaging in a heated altercation. Appellant's friends also came up close to Olivio's face saying negative things to her as well.

Trial Court Opinion, 3/20/22, at 2-4 (cleaned up) (some citations to the record omitted).

After weighing the testimony and evidence, the trial court determined that Appellant knew, or reasonably should have known, that his verbal abuse constituted wrongful conduct. **See Boyer**, **supra**. The court opined that Appellant's entry into the bakery might have been coincidental, but as the court observed, Appellant said he had seen Olivio's car in the parking lot. This fact is mostly beside the point. When Appellant realized Olivio was inside the bakery, the court found that Appellant chose to stay and accost Olivio. The trial court disagreed with Appellant's argument that that Olivio's statement to him – that he was not allowed to be there – was a mitigating factor in this instance.

On appeal, Appellant likens his case to **Haigh** to argue that he did not threaten Olivio. But this argument fails for a variety of reasons. First, **Haigh** does not apply here. As a matter of law, **Haigh** does not require the defendant to make verbal threats for the defendant's conduct to be construed as wrongful. For instance, other wrongful conduct, such as stalking, would also be a violation of the order. Second, **Haigh** is also distinguishable on its

facts. There, we held that the court abused its discretion when it found the defendant in indirect criminal contempt, because the defendant did not have wrongful intent when he asked the wife about her health. "A reasonable person could have believed, and [the defendant] did believe, that the PFA order was relaxed to some extent in the courtroom context, especially where the [defendant] was shackled and the victim was protected by an armed deputy sheriff." *Haigh*, 874 A.2d at 1177.[3]

Here, by contrast, Appellant's entry into the bakery might have been innocent until he stayed and harassed Olivio. Although the interaction lasted a matter of minutes, the altercation was heated to the point that the bakery asked them both to leave and called law enforcement. This is a far cry from the "peculiar circumstances" of *Haigh*. That Olivio was also subject to a cross-PFA order is largely irrelevant to the question of whether Appellant violated his. We suppose the court could have found Olivio's behavior to be indicative of Appellant's lack of wrongful intent. But that is not what the court determined, and we will not disturb that finding.

_____

[3] To be perfectly clear, we do not suggest that courthouses provide defendants a safe harbor to violate PFA orders. It is not uncommon for PFA defendants, believing that they are shielded by a cloak of plausible deniability, to commit a violative act in a courtroom. *See, e.g., C.L. v. Lewis*, -- A.3d. --, 2020 WL 1193399, at *1 (Pa. Super. 2020) (non-precedential decision) (affirming an indirect criminal contempt conviction where the husband's wrongful conduct included: making a beeline toward the wife to sit behind her in a half-empty courtroom; speaking in a loud, obnoxious, and aggressive tone so she could hear; and pointedly turning toward and smirking at the wife upon exiting the courtroom).

Appellant's reliance on **Haigh** fails for still another reason. This case could be analogous to **Haigh** if, and only if, we re-weighed the evidence and viewed it in a light most favorable to Appellant. But again, this is not how we review appeals from orders finding a PFA defendant in contempt. Instead, we are confined to a determination of whether the facts support the trial court's decision, and we will reverse a trial court's determination only where there has been a plain abuse of discretion. **Commonwealth v. Wilson**, 227 A.3d 928, 933 (Pa. Super. 2020) (citation omitted). Having found no abuse of discretion under these facts, we affirm the trial court order.

Order affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 10/28/2022