J-A21018-25

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT O.P. 65.37**

| MITCHELL BARRY | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| | : | |
| v. | : | |
| | : | |
| | : | |
| AMANDA LYONS | : | |
| | : | |
| Appellant | : | No. 1867 MDA 2024 |

Appeal from the Judgment of Sentence Entered December 11, 2024
In the Court of Common Pleas of Lancaster County Civil Division at
No(s):  CI-24-07171

BEFORE:  PANELLA, P.J.E., LANE, J., and STEVENS, P.J.E.[*]

MEMORANDUM BY LANE, J.:                    **FILED: NOVEMBER 19, 2025**

Amanda Lyons ("Lyons") appeals from the judgment of sentence imposed following her conviction for indirect criminal contempt ("ICC")[1] of a Protection from Abuse ("PFA")[2] order.  Based on our careful review, we are constrained to reverse her conviction and vacate the judgment of sentence.

On October 7, 2024, the trial court entered a temporary PFA order against Lyons to protect Mitchell Barry ("Barry") and the parties' seven-year-old son, G.L., pending a final PFA hearing.  The temporary PFA order instructed that Lyons was "prohibited from having any contact with [Barry], or any other person protected under this order, either directly or indirectly, at any

_____

footnote

[*] Former Justice specially assigned to the Superior Court.

[1] *See* 23 Pa.C.S.A. § 6114(a).

[2] *See* 23 Pa.C.S.A. §§ 6101-6122 (Protection from Abuse Act).

location[, and that she could] not contact [Barry], or any other person protected under this order, by telephone or by any other means, including through third persons." Order, 10/7/24, at 1-2.

On October 22, 2024, the date initially scheduled for the final PFA hearing, Barry motioned the court for a continuance, and the trial court continued the hearing to November 19, 2024. In doing so, however, the trial court modified the temporary PFA order to permit Lyons to have: (1) "daily [F]ace[T]ime contact" with G.L. at 8 p.m., with the restriction that it be "peaceful [and] not about [the] case[;]" and (2) "up to [six hours] of supervised visits [with G.L. per] week at Child First Services[.]" Order, 10/22/24, at unnumbered 1. The order was silent as to how long the daily FaceTime calls could last. The order was also silent as to how the daily FaceTime calls were to be initiated, who could initiate them, what devices could be used by the parties to conduct the calls, and whether or how the parties could alter the time of the evening FaceTime call in the event of a delay or scheduling conflict. However, as best we can discern from the record, it appears that Lyons had been initiating the calls by using her cell phone to contact Barry via his cell phone.

Pursuant to the modified temporary PFA order, on October 27, 2024, Lyons had her first supervised visitation with G.L. at Child First Services. Later that same day, Lyons had a FaceTime call with G.L. At some point during this call, G.L. indicated to Lyons that he wanted to end the call. Lyons, who did

not want the call to end, instead offered to remain on the call in silence while G.L. watched a program that he wanted to watch. Nevertheless, G.L. ended the call. Barry then received a text message on his cell phone stating "[i]f he is still upset, he can call me back." N.T., 12/11/24, at 14. Based on this text message, Barry contacted police to report that Lyons violated the modified temporary PFA order. Police then filed an ICC complaint alleging that on October 27, 2024, Lyons violated the modified temporary PFA order by using her cell phone to contact Barry by sending him a text message.

The matter proceeded to a violation hearing before the trial court, during which the Commonwealth presented testimony from Barry and the investigating police officer, Officer Phillip Boyle ("Officer Boyle").[3] Lyons did not testify in her defense. Relevantly, Barry testified that on the evening of October 27, 2024, he initiated the FaceTime call between Lyons and G.L. by using his cell phone to call Lyons' cell phone. In doing so, however, he explained that this call was atypical, as Lyons was "[n]ormally" the one to initiate these calls by placing a call to his cell phone. N.T., 12/11/24, at 17, 19. Barry subsequently expressed that while he observed G.L. speaking to

---

[3] We note that the hearing transcript is not included in the certified record; however, a copy of the transcript is included in Lyons' reproduced record. As the Commonwealth does not contest the accuracy of this document, we choose to consider it for our instant review. *See Commonwealth v. Holston*, 211 A.3d 1264, 1276 (Pa. Super. 2019) (*en banc*) (citing Pa.R.A.P. 1921 Note) (stating "where the accuracy of a document is undisputed and contained in the reproduced record, we may consider it").

Lyons during this call, it appeared to him that G.L. "didn't want to be on the phone[,]" as G.L. had "just spent six hours with" Lyons at Child First Services earlier that day. *Id*. at 12. When G.L. ended the FaceTime call soon thereafter, despite his mother's offer to "just sit on the phone in silence while he watches his show[,]" Barry testified he then received a text message from Lyons,[4] stating "[i]f he is still upset, he can call me back." *Id*. at 12, 14. Notably, Barry acknowledged that this message was non-threatening to both himself and G.L., and the content of the text only concerned G.L.'s "general welfare [and] emotional state[.]" *Id*. at 19-20, 27-28.

When the Commonwealth moved to admit a screenshot of the text message into evidence, as taken by Barry from his cell phone, Lyons' attorney objected to its admission. Specifically, defense counsel argued that the screenshot was not properly authenticated as "there was no number that connects the text message to [Lyons, and] a picture of [G.L., alone, was] not enough to establish [this] nexus." *Id*. at 15. The trial court overruled the objection, reasoning as follows:

> . . . I'm going to allow it. [Barry] testified that the photo is a picture of the shared child. The identification of the name on the call is the name of the child that [Barry] stores the mother's name or the phone number under, and [he] indicated that he's

---

[4] Barry explained that he knew that Lyons had sent him this message, as he had "her number stored" on his phone under G.L.'s name and photo, had "received text messages from that number before[,]" and did not know of "anybody else who would have said that to [him] at that time[.]" N.T., 12/11/24, at 13-16.

- 4 -

had prior communication with the mother that's on this text message. And then [Barry explained] the context of the text at issue, [such] that [it] was [sent] immediately after the terminated Face[T]ime call. So all told, I think the proper foundation was laid.

*Id*.

Upon the resumption of his direct examination, Barry testified that he contacted Officer Boyle after receiving the text message, and that the officer reviewed the text message at Barry's home the next day to determine whether it constituted a violation of the temporary modified PFA order. Officer Boyle then testified that he believed the text message constituted a PFA violation, and that he filed charges accordingly. At the conclusion of the hearing, the trial court found Lyons guilty of ICC. The matter proceeded directly to sentencing, whereupon the trial court imposed a term of six months' probation for this crime. Lyons filed a timely notice of appeal, and both she and the trial court complied with Pa.R.A.P. 1925.

Lyons raises the following issues for our review:

1. Whether the trial court erred in law and/or abused its discretion when it found [Lyons] guilty of [ICC].

2. Whether the trial court erred in law and/or abused its discretion when it found that a text message allegedly sent by [Lyons] was made with wrongful intent.

3. Whether the trial court erred in law and/or abused its discretion when it admitted into evidence a text message allegedly from [Lyons] which was not properly authenticated.

Lyons' Brief at 4 (unnecessary capitalization omitted).

As Lyons' first two issues challenge the sufficiency of the evidence underlying her conviction for ICC, we address them together. A challenge to the sufficiency of the evidence presents a question of law for which our standard of review is *de novo*, and our scope of review is plenary. **See Commonwealth v. Johnson**, 236 A.3d 1141, 1152 (Pa. Super. 2020) (*en banc*). When considering a challenge to the sufficiency of the evidence:

> [W]e evaluate the record in the light most favorable to the verdict winner giving the prosecution the benefit of all reasonable inferences to be drawn from the evidence. Evidence will be deemed sufficient to support the verdict when it establishes each material element of the crime charged and the commission thereof by the accused, beyond a reasonable doubt. Nevertheless, the Commonwealth need not establish guilt to a mathematical certainty. Any doubt about the defendant's guilt is to be resolved by the fact finder unless the evidence is so weak and inconclusive that, as a matter of law, no probability of fact can be drawn from the combined circumstances.

> The Commonwealth may sustain its burden by means of wholly circumstantial evidence. Accordingly, the fact that the evidence establishing a defendant's participation in a crime is circumstantial does not preclude a conviction where the evidence coupled with the reasonable inferences drawn therefrom overcomes the presumption of innocence. Significantly, we may not substitute our judgment for that of the fact finder; thus, so long as the evidence adduced, accepted in the light most favorable to the Commonwealth, demonstrates the respective elements of a defendant's crimes beyond a reasonable doubt, the appellant's convictions will be upheld.

**Commonwealth v. Franklin**, 69 A.3d 719, 722-23 (Pa. Super. 2013) (quotations marks, brackets, and citations omitted). Importantly, "the trier of fact while passing upon the credibility of witnesses and the weight of the evidence produced, is free to believe all, part or none of the evidence."

*Commonwealth v. Orr*, 38 A.3d 868, 873 (Pa. Super. 2011) (*en banc*) (citations and brackets omitted).

As this Court has explained:

A charge of [ICC] consists of a claim that a violation of an order or decree of court occurred outside the presence of the court. Where a PFA order is involved, an [ICC] charge is designed to seek punishment for violation of the protective order.

* * * *

To establish [ICC], it must be shown that 1) the order was sufficiently clear to the contemnor as to leave no doubt of the conduct prohibited; 2) the contemnor had notice of the order; 3) the act must have been one prohibited by the order; and 4) the intent of the contemnor in committing the act must have been wrongful.

*Commonwealth v. Smith*, 288 A.3d 126, 131 (Pa. Super. 2022) (citations omitted). "When reviewing a contempt conviction[,] we are confined to a determination of whether the facts support the trial court decision. We will reverse a trial court's determination only when there has been a plain abuse of discretion." *Commonwealth v. Brumbaugh*, 932 A.2d 108, 111 (Pa. Super. 2007).

"In contempt matters, wrongful intent can be imputed by virtue of the substantial certainty that one's actions would place one in contact with [a] PFA petitioner in violation of the PFA order." *Commonwealth v. Wilson*, 227 A.3d 928, 939 (Pa. Super. 2020) (quotations, original brackets, and unnecessary capitalization omitted); *see also Commonwealth v. Felder*, 176 A.3d 331, 333 (Pa. Super. 2017) (holding that the defendant acted with

the requisite wrongful intent to violate a final PFA order prohibiting him from abusing, harassing, stalking, or threatening his wife, where the evidence showed that he refused his wife entry into their home and prevented her subsequent attempts to reach through the screen door and unlock it from the outside by grabbing her fingers and twisting them with such force that her fingers "started getting numb" and she was forced to relent); **Brumbaugh**, 932 A.2d at 111 (finding evidentiary support for the element of wrongful intent where contemnor, knowing that he was under a PFA order prohibiting contact, nevertheless accepted the PFA petitioner's invitation to drive to and attend a party with her and her friends).

Pertinently, however, this Court has explained that "[i]t is imperative that trial judges use common sense and consider the context and surrounding factors in making their determination of whether a violation of a court order is truly **intentional** before imposing sanctions of criminal contempt." **Commonwealth v. Haigh**, 874 A.2d 1174, 1178 (Pa. Super. 2005) (emphasis in original); **see also Commonwealth v. Reese**, 156 A.3d 1250, 1257 (Pa. Super. 2017) (reaffirming the instruction that the trial court "should use common sense and consider context" when determining whether a defendant acted with wrongful intent for purposes of ICC). The **Haigh** Court emphasized that "a determination of criminal contempt is a criminal conviction conferring on the contemnor all the negative characteristics of being a convicted criminal[,]" and that "[t]he right to be free of the stigma of an

unfounded criminal conviction is the hallmark of American jurisprudence."
**Haigh**, 874 A.2d at 1177-78 (*quoting* **Commonwealth v. Baker**, 722 A.2d
718, 722 (Pa. Super. 1998) (*en banc*)).

In **Haigh**, this Court overturned a conviction for ICC on the basis that a
shackled defendant did not act with wrongful intent to violate a PFA order
where he appeared before the court at an ICC hearing and in the courtroom
asked his wife, the PFA complainant, about her health following her recent
cancer diagnosis. In reaching this conclusion, the **Haigh** Court explained that,
although the PFA order prevented the defendant from having contact with his
wife "at any location," the courtroom "context ultimately caused confusion for
Appellant in that he was literally brought into a form of contact with his wife
during the PFA violation hearing." **Id**. at 1177. The **Haigh** Court additionally
noted that both the defendant and his wife had the opportunity to speak at
the hearing. **See id**. The **Haigh** Court observed that:

> A reasonable person could have believed, and Appellant did
> believe, that the PFA order was relaxed to some extent in the
> courtroom context, especially where Appellant was shackled and
> the victim was protected by an armed deputy sheriff. Appellant
> did not believe that he was threatening Mrs. Haigh, and neither
> she nor any one else in the courtroom heard Appellant threaten
> her or otherwise make any threatening movements or gestures
> towards her. Appellant's questions arose from his concern for the
> health of his wife of thirty-one years, even though they were
> estranged at the time. After a thorough review of the record, we
> conclude, based upon all of the circumstances, that Appellant did
> not act with wrongful intent by engaging in this conversation with
> his wife in the courtroom. Intentionally acting in such a manner,
> in the presence of Judge Campbell, the deputy sheriff, the
> prosecutor and every other person gathered in the court room,
> would have been nothing short of irrational, and there is nothing

in the record to indicate that Appellant was in any way irrational on the day of the hearing.

*Haigh*, 874 A.2d at 1177. Under these particular circumstances, the *Haigh* Court concluded that the trial court abused its discretion by convicting the appellant of ICC because "the record does not support the determination that [he] intended to violate the final PFA order *and* because the infraction was both *de minimis* and non-threatening." *Id*. at 1178 (emphasis in original).

Lyons argues the trial court erred by finding the evidence sufficient to convict her of ICC as she believes she did not send the underlying text message with the requisite wrongful intent. In doing so, Lyons asserts that her case is factually dissimilar to both *Felder* and *Brumbaugh*. Instead, she contends that, similar to *Haigh*, the ten-word text message solely concerning G.L.'s emotional state was both *de minimis* and non-threatening. Lyons urges this Court to consider the context surrounding the text message at-issue, noting that it was an emotional time for G.L. given that it was the first day of supervised visitation and she and G.L. had not seen one another for three weeks. Further, Lyons emphasizes that the modified temporary PFA order permitted some contact between her and Barry "to facilitate communication between [herself] and [G.L.] during [their] daily virtual communication[,]" and that by Barry's "own admission, he initiated the [FaceTime] call" that evening prior to receiving the non-threatening text message. Lyons' Brief at 14-15. Lyons thus submits that "[t]he contents of the alleged text message clearly show[ that she] did not intend to violate the PFA[ order, as] she limited her inquiry to G.L.'s emotional state." *Id*. at 15. Consequently, Lyons contends

- 10 -

that because the record, even when viewed in the light most favorable to Barry, does not support a finding that she wrongfully intended to violate the PFA order beyond a reasonable doubt, the trial court should not have found her guilty of ICC.[5]

After considering Lyons' sufficiency challenge, the trial court determined that it was without merit, reasoning as follows:

> In the instant matter, considering the body of evidence presented by the Commonwealth, the court's guilty verdict was consistent with the evidence presented at the hearing. Regarding the first three prongs of the offense, the Commonwealth presented unrefuted evidence establishing the clarity of the court's order, that [Lyons] had notice of the order, and that the violating action was volitional.
>
> Looking to the final prong, the Commonwealth provided sufficient evidence to show that [Lyons] acted with wrongful intent beyond a reasonable doubt. The non[-]threatening content of [Lyons'] text message is not determinative of whether [she] acted with wrongful intent. The court found [Barry's] testimony that [Lyons] communicated with him via text message, albeit civilly, to be credible. Regardless of [Lyons'] purpose in sending the message, such contact with [Barry] was clearly and specifically prohibited by the existing PFA order, of which [Lyons] had notice. In short, the evidence established that [Lyons] was aware that the PFA order prohibited her from contacting [Barry,] and yet she sent [him] a text message communication to his phone. [Lyons'] clear intent was to be in contact with [Barry] notwithstanding the temporary [PFA] order. In viewing all the evidence admitted at trial in the light most favorable to the verdict winner, there is sufficient evidence to enable the factfinder to find every element of the crime proven beyond a reasonable doubt.

---

[5] Lyons additionally argues that the verdict "went against the weight . . . of the evidence." Lyons' Brief at 11. However, any challenge to the weight of the evidence is waived, as she did not raise such a challenge in her Rule 1925(b) concise statement. *See* Pa.R.A.P. 1925(b)(4)(vii) (providing that issues not raised in the concise statement are waived).

Trial Court Opinion, 2/7/25, at 9-10 (footnote, citations, and unnecessary capitalization omitted).

Here, even after reviewing the record in the light most favorable to Barry as the verdict winner, we are constrained to conclude that the evidence of record is insufficient to support Lyons' ICC conviction. Initially, we conclude that the order was not sufficiently clear to Lyons, as the contemnor, to leave no doubt as to the type of conduct prohibited. **See Smith**, 288 A.3d at 131. Notably, the terms of the initial temporary PFA order provided that Lyons was to have no contact whatsoever with Barry or G.L. Those terms were directly at odds with the terms of the modified temporary PFA order to the extent that it permitted a daily FaceTime call with G.L. However, the trial court provided no clarity in the modified temporary PFA order as to how the parties were to arrange for and conduct these FaceTime calls. Indeed, the order did not set a definitive time limit for the FaceTime calls, nor did it provide the parties with any directive as to who could initiate the calls, the devices on which the calls could or could not be made, and whether or how the parties were to communicate regarding any delay or scheduling conflict. Under these circumstances, an individual in Lyons' position could have reasonably believed that the PFA order was somewhat relaxed with respect to the FaceTime calls and their management. **See Haigh**, 874 A.2d at 1178.

Moreover, as explained above, it is imperative that trial judges use common sense and consider the context and surrounding factors in making

their determinations as to whether a violation of a court order is truly intentional before imposing sanctions of criminal contempt. **See Haigh**, 874 A.2d at 1177. Here, on the date in question, Lyons had not seen her son for three weeks. Although the record indicates that Lyons was able to spend six hours with G.L. earlier that day, the record is clear that she did not want the FaceTime call to end and even offered to remain on the call in silence to spend more time with her son. After G.L. ended the call, Lyons then texted Barry "[i]f he is still upset, he can call me back." N.T., 12/11/24, at 14. This short text message does not establish that Lyons's communication with Barry was abusive, harassing, or threatening. To the contrary, it was *de minimis* and non-threatening. Indeed, Barry conceded that this text message did not threaten either himself or G.L. **See id**. at 19-20. Further, the trial court acknowledged that the text message was civil and non-threatening. **See** Trial Court Opinion, 2/7/25, at 9-10. In our view, this sequence of events and the content of the text message demonstrate that Lyons contacted Barry for the purpose of resuming her allotted FaceTime call with her seven-year-old child, in accordance with the modified temporary PFA order, and out of a concern for his well-being. Thus, because we determine both that the modified temporary PFA order was not sufficiently clear regarding the prohibited conduct, and that the record does not support the determination that Lyons acted with wrongful intent to violate the modified temporary PFA order, we

are constrained to conclude that the trial court abused its discretion in convicting Lyons of ICC. ***See Haigh***, 874 A.2d at 1178.[6]

Conviction reversed, judgment of sentence vacated.

Judgment Entered.

_Benjamin D. Kohler_

Benjamin D. Kohler, Esq.
Prothonotary

Date: 11/19/2025

---

[6] Given our disposition regarding Lyons' sufficiency challenge, we need not reach the merits of her final issue.